FT. WORTH & D. C. RY. CO. v. WESTERN STOCKYARDS CO. et al.

(Court of Civil Appeals of Texas. Amarillo. Nov. 16, 1912. Rehearing Denied Dec. 7, 1912.)

1. PUBLIC LANDS (§ 172*)—GRANT OF RIGHT OF WAY—CONSTRUCTION.

The grant of a right of way 200 feet in width to the Ft. Worth & Denver City Railway Company by special act of the Legislature in 1873 (chapter 208) was a grant effective in præsenti and subsequent grantees located their certificates, and their assigns took, subject to such legislative grant.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 523–543; Dec. Dig. § 172.*]

2. PUBLIC LANDS (§ 172*)—GRANT OF RIGHT OF WAY—REVOCATION.

Where a grant of land to a railroad for right of way rested upon a condition subsequent, failure to perform such condition did not operate to revoke the grant, but merely authorized the state to forfeit it by judicial proceedings or legislative act.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 523–543; Dec. Dig. § 172.*]

3. PUBLIC LANDS (§ 172*)—GRANT OF RIGHT OF WAY — ACCEPTANCE OF DEED—ESTOPPEL.

The fact that a railroad, after receiving from the state a grant of land 200 feet in width, accepted a deed from a subsequent settler to a strip of such grant 100 feet wide, did not estop it from suing for the full 200 feet.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 523–543; Dec. Dig. § 172.*]

4. PUBLIC LANDS (§ 172*)—ACCEPTANCE OF DEED—RAILROAD GRANT.

Where a railroad to which the Legislature had granted a strip of land contracted with the

party claiming title to one-half the strip from a subsequent settler, relative to the building of stockyards upon such half, and such contract described the land belonging to the railroad company by a blue print and map which did not include such half, such contract, being an unequivocal admission that its claim of right of way did not include this part, estopped it from thereafter claiming same, especially where it appeared that the other contracting party and his assigns had incurred great expense in purchasing adjacent property and constructing valuable improvements.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 523–543; Dec. Dig. § 172.*]

5. ADVERSE POSSESSION (§ 41*)—ACQUISITION OF TITLE—RAILROAD GRANT.

Where a person and his assigns claiming title under a settler held adverse possession for 15 years of 100 feet of the 200 feet of land granted to a railroad for a right of way, they acquired title by adverse possession.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 184–206; Dec. Dig. § 41.*]

Appeal from District Court, Potter County; J. N. Browning, Judge.

Action by the Ft. Worth & Denver City Railway Company against the Western Stockyards Company and others. From a judgment for defendants on a directed verdict, plaintiff appeals. Affirmed.

Turner & Wharton, of Amarillo, and Spoonts, Thompson & Barwise, of Ft. Worth, for appellant. Madden, Trulove & Kimbrough, and F. M. Ryburn, all of Amarillo, for appellees.

HALL, J. This suit was instituted by appellant railway company against the Western Stockyards Company and the Panhandle Packing Company to recover a strip of land 50 feet in width, being a portion of section 137, block 2, A. B. & M. surveys, Potter county, Tex. The strip of land in question, beginning 1,400 feet west of the eastern boundary line of said section at a point 50 feet north of the center of plaintiff's main track for the southeast corner, thence north 50 feet for the northeast corner, and said strip 50 feet in width extending in a westerly direction parallel wih plaintiff's main track to a point 2,065 feet east of the west boundary line of said section. The petition is in the usual form of trespass to try title, and contains a second count, pleading plaintiff's title in detail. The substance of the second count is that plaintiff acquired the strip of land in question by virtue of its charter granted by special act of the Legislature in 1873 (Laws 1873, c. 208), section 8 of said act being as follows: "That the right of way to be to the extent of 200 feet wide is hereby granted to said railway company through the public lands of the state of Texas and also the right to take and use in the construction of said road any timber or other material used in the construction of railways found lying upon any part of the public lands of this state." The charter authorized the road to be con-

structed from a point at or near Ft. Worth, Tex., beginning at a junction with the Texas & Pacific Railway, and continuing in a northwesterly direction to the western boundary line of the state of Texas, in the direction of the city of Denver, Colo.; that plaintiff began the actual work of locating said line of road within one year after the date of its charter, and continued in accordance with the requirements of the law until the line was constructed, equipped, and in operation, which was in the month of April, 1888; that the road was constructed across the section in question in the year 1887; that at the time of the granting of its charter and until July 20, 1875, said land was known as section 137, and was vacant, unappropriated public domain, having been surveyed, located, and patented after July, 1875; that, by reason of the construction of its road, it became entitled to a strip of land 200 feet in width across said section; that the land in controversy is a part of the town of Amarillo, which town has since the construction of plaintiff's road become a large and important shipping point having about 10,000 population, with two other lines of railway intersecting plaintiff's line at said point, and it has become necessary for plaintiff to use and occupy the whole of said strip of land 200 feet in width across said section for tracks, switches, and other facilities for the proper operation and management of its said line of road. The petition further sets out the history and origin and establishment of Western Stockyards Company, and alleges that said company constructed certain stock pens and stockyards on plaintiff's line of road north of its main track, and was occupying the land in controversy, except that portion of it which had been conveyed by said Stockyards Company to the Panhandle Packing Company, a second corporation. Some of the questions presented for our consideration by this appeal have been considered by us in disposing of the case of Ft. Worth & Denver City Railway Co. v. Southern Kansas Railway Co. et al., 151 S. W. 850, by our opinion, dated November 2, 1912, and not yet officially reported. We see no reason for holding other than we did in that case that the language of the grant, when construed in connection with the presumption that the track would be built in the center of the right of way as granted, sufficiently designates the property granted.

[1] We also held in said case that the grant was effective in præsenti, nor do we see any reason for changing our opinion upon that issue. In the case of St. J. & D. C. R. R. Co. v. Baldwin, 103 U. S. 426, 26 L. Ed. 578, there was a grant to the appellant railway company, the sixth section of which is as follows: "And be it further enacted that the right of way through the public lands be and the same is hereby granted to said St. Joseph & Denver City Railway Company, its

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

successors and assigns, for the construction of a railroad as proposed and the right is hereby given to said corporation to take from the public lands adjacent to the line of said road, material for the construction thereof. Said way is granted to said railroad to the extent to 100 feet in width on each side of said road, where it may pass through the public domain," etc. Mr. Justice Field, in delivering the opinion of the court, stated that the act of Congress in question made two distinct grants, one of which was of a right of way directly to the company itself, and uses this language: "But the grant of the right of way by the sixth section contains no reservations or exceptions. It is a present, absolute grant, subject to no conditions except those necessarily implied, such as that the road shall be constructed and used for the purposes designated, nor is there anything in the policy of the government with respect to the public lands which would call for any qualification of the terms. Those lands would not be the less valuable for settlement by a road running through them. On the contrary, their value would be greatly enhanced thereby. The right of way for the whole distance of the proposed route was a very important part of the aid given. If the company could be compelled to purchase its way over any section that might be occupied in advance of its location, very serious obstacles would be often imposed to the progress of the road. For any loss of lands by settlement or reservation, other lands are given, but for the loss of the right of way by these means no compensation is provided, or could any be given by the substitution of another route. The uncertainty as to the ultimate location of the line of road is recognized throughout the act, and, where any qualification is intended in the operation of the grant of lands from this circumstance, it is designated. Had a similar qualification upon the absolute grant of the right of way been intended, it can hardly be doubted that it would have been expressed. The fact that none is expressed is conclusive that none exists. We see no reason therefore for not giving to the words of present grant with respect to the right of way the same construction which we should be compelled to give according to our repeated decisions, to the grant of lands, had no limitation been expressed. We are of the opinion, therefore, that all persons acquiring any portion of the public lands after the passage of the act in question took the same subject to the right of way conferred by it for the proposed road." In this case the act of Congress reserved in that part of the special charter granting lands to the state of Kansas for the benefit of said road all lands that had been previously granted or which had been appropriated by pre-emption or homestead settlement, and the facts show that at the time of said grant the route of the road had not been fixed.

There is in the instant case an agreed statement of facts, a part of which is as follows: "That at the time said act was passed (May 26, 1873) all that portion of Northwestern Texas, within 100 miles of the land in controversy, and over which said corporation's line of railroad and telegraph lines were subsequently located and constructed, was uninhabited and a large portion thereof (all that portion being on what is called 'Staked Plains,' including where the land in controversy is located) was rarely visited or seen by man or beast, except that after the spring rain and green grass would come, usually in May or June, the buffalo and wild horse would roam there in large numbers to graze during the remainder of the spring and summer seasons, and bands of Indians would come and roam from their reservations to hunt. This condition of affairs in said territory continued for a year or more after said act was passed, so that during said time the land in controversy and a very large portion of Northwestern Texas over which said line of railroad has been subsequently located was what is known as 'frontier,' and subject to incursions, and depredations by hostile bands of Indians, such as history shows to have been the conditions in far out frontier counties, rendering an undertaking of a survey and location of said line at said time correspondingly dangerous to life and property as well as expensive." We presume that the above facts are shown in order to excuse appellant's failure to comply with the fifteenth section of the special act, requiring appellant to file with the Commissioner of the General Land Office within six months after the organization of the company plans and maps, showing the line upon which it intended to construct its road. These facts are unnecessary in our opinion, because the grant took effect in præsenti. The case of Railway Co. v. Baldwin, supra, is only one of many cases decided by the Supreme Court of the United States, construing similar grants to railroads of a right of way across public lands, among which we cite D. & R. G. Ry. Co. v. Alling, 99 U. S. 475, 25 L. Ed. 443, in which it is said: "We do not doubt that the intention of Congress was to grant to the company a present beneficial easement in the particular way over which the designated routes lay, capable, however, of enjoyment only when the way granted was actually located, and in good faith appropriated for the purposes contemplated by the charter of the company and the act of Congress. When such location and appropriation took place, the title, which was previously imperfect, acquired precision, and by relation took effect as of the date of the grant. The settled doctrine of this court would seem to justify that conclusion." The grant to the Denver & Rio Grande Railway Company was almost identical with the language of the grant in this case. In construing the act of March 13, 1875, in Noble v. U. R. L. Ry. Co., 147 U. S.

165, 13 Sup. Ct. 271, 37 L. Ed. 123, it is said: "The lands over which the right of way was granted were public lands, subject to the operation of the statute, and the question whether the plaintiff was entitled to the benefit of the grant was one which it was competent for the Secretary of the Interior to decide, and, when decided and his approval was noted upon the plots, the first section of the act vested the right of way in the railway company. The language of that section is 'that the right of way over the public lands of the United States is hereby granted to any railroad company duly organized under the laws of any state or territory,' etc. The uniform rule of this court has been that such an act was a grant in præsenti of lands to be thereafter identified. The railroad company became at once vested with a right of property in these lands of which they can only be deprived by a proceeding taken directly for that purpose. If it were made to appear that the right of way had been obtained by fraud, a bill would doubtless lie by the United States for the cancellation and annulment of an approval thus obtained." In M., K. & T. Ry. Co. v. Cook, 163 U. S. 495, 16 Sup. Ct. 1095, 41 L. Ed. 489, the grant was as follows: "That the right of way through the public lands be and the same is hereby granted to said Pacific Railway Company, Southern Branch, its successors, and assigns, for the construction of a railroad as proposed. Said way is granted to said railroad to the extent of 100 feet in width on each side of said road where it may pass through the public domain," etc. In construing said section, the court said: "The same conclusion necessarily followed in respect to the right of way. The grant of the lands and the grant of the right of way were alike grants in præsenti, and stood on the same footing so that before the definite location all persons acquiring any portion of the public lands after the passage of the act took the same subject to the right of way for the proposed road. The easement and the lands were afloat until by definite location precision was given to the grant and they became permanently fixed." These and other decisions to the same effect seem to us to be conclusive, and, if we are correct in this, the original grantee, Adams, Beatty & Moulton, located their certificate subject to the provisions of this special charter, and their assignee, F. W. Levings, took no greater right, but acquired the land subject to the same burden, and conveyed no greater right than he had to H. B. Sanborn, who on the 29th day of June, 1905, conveyed the land to appellee Stockyards Company. We think we are sustained in our conclusions by Olive v. Sabine & E. T. Ry. Co., 11 Tex. Civ. App. 208, 33 S. W. 139; Texas Central Ry. Co. v. Bowman, 97 Tex. 417, 79 S. W. 295; McLucas v. St. J., etc., Ry., 67 Neb. 603, 93 N. W. 928, 97 N. W. 312, 2 Ann. Cas. 715; Churchill v. Choctaw Ry., 4 Okl. 462, 46 Pac. 503; Flint,

etc., P. M. Ry. v. Gordon, 41 Mich. 420, 2 N. W. 648, and other cases cited therein.

[2] We believe the weight of authority to be that, if the grant rests upon a condition such as that contained in section 15 of appellant's charter, it is a condition subsequent, and that the failure to perform a condition subsequent does not operate as a revocation of the grant, but merely authorizes the state to take advantage of it and forfeit it by judicial proceedings or by some positive act of the Legislature, resuming title to the land. Utah, etc., R. R. Co. v. Railroad Co. (C. C.) 110 Fed. 879; San Pedro v. S. P. Ry. Co., 101 Cal. 333, 35 Pac. 993; C. P. Ry. Co. v. Dyer, 1 Sawy. 641, Fed. Cas. No. 2,552; 32 Cyc. 989 (Ill.); 26 Am. & Eng. Encyc. of L. 436 et seq.

[3] Appellant's third assignment of error raises the question as to whether or not its acceptance of a deed from H. B. Sanborn in 1893, conveying to it a strip of land 100 feet wide out of section 137, creates an estoppel against its right to maintain this suit for the full 200 feet in width under its grant from the state. The case of Bybee v. O. & C. Railway Co., 139 U. S. 663, 11 Sup. Ct. 641, 35 L. Ed. 305, is in point, and seems to us to be conclusive of this issue. There the grant to the railway company was for alternate sections to the amount of 20 sections per mile, but it also gave a right of way through public lands to the extent of 100 feet in width on each side of the road. The date of this grant was July 25, 1866, and its line of road was not completed until July 1, 1880. In the interim, the plaintiff, Bybee, under the act of Congress July 26, 1866, settled on the land over which the right of way in controversy was afterwards claimed, and acquired a legal claim under said act, the date of his occupation being 1879, and before the railroad company had located its right of way across his particular section or in any manner indicated an intention to build across it. When in the construction of the road his land was reached, the railway company paid him $250 for right of way across it, and agreed that the road should not damage any of the ditches belonging to plaintiff on said land. After the construction of the road, Bybee filed suit to recover damages because of alleged injuries to one of his ditches, and the court held that the company was not only not estopped by taking the deed from Bybee, but that it obtained nothing by reason of such deed because it already had superior title to its right of way, and in disposing of the issue used this language: "With regard to the question of estoppel the complainant alleges that the defendant went into possession of that portion of the plaintiff's ditch across which its road was constructed, under a deed from plaintiff and his tenant in common for a consideration of $250 paid, and assented to the condition therein contained against impairing or destroying said

ditch,. the only right conveyed being a license 'to enter on said ditch and construct and operate its road over the same' upon such condition. The contention of the plaintiff is that in receiving this deed and entering into possession the relation of landlord and tenant was created between them, and not that of vendor and vendee, so far as the doctrine of estoppel is concerned. But as the deed was the conveyance of a perpetual right for a solid consideration therein expressed, and there was no covenant for the payment of any rent, nor for redelivery of possession, we think it should be regarded as creating the relation of grantor and grantee 'between the parties thereto. We have already found that the title of the company to its right of way upon the location of its route related back to the date of the act, and hence, when it took possession of the land in question, plaintiff had no title thereto which he could set up against the company. Had the defendant not accepted the deed from the plaintiff, it might, under 'our ruling upon the first point, have treated him as a trespasser. The real question then is whether the defendant is placed in a worse position by having accepted the deed from a party who had no title to the premises he assumed'.to convey; the defendant having taken the conveyance under a mistaken view of the law applicable to the case. It is conceded that as a general principle the grantee in deed of conveyance is not estopped to deny the title of his grantor, and, unless this case be an exception to this rule, it will necessitate an affirmance of this judgment. The rule was first applied by this court in the case of Blight v. Rochester, 20 U. S. (7 Wheat.) 535, 5 L. Ed. 516, in favor of the grantee, who was permitted to show that the person from whom he derived title was an alien, and, under the laws then existing, incapable of transmitting by inheritance the title to lands in this country. In Merryman v. Bourne, 76 U. S. (9 Wall.) 595, 19 L. Ed. 683, it was stated that the vendee 'holds adversely to all the world, and has the same right to deny the title of his vendor as the title of any other party,' and in Robertson v. Pickrell, 109 U. S. 608 [3 Sup. Ct. 407, 27 L. Ed. 1049], it was held in an elaborate opinion by Mr. Justice Field that defendants, who held under a deed of a life estate, were not estopped from setting up a superior title. Cases in the state courts to the same effect are Comstock v. Smith, 13 Pick. (Mass.) 116 [23 Am. Dec. 670], Osterhout v. Shoemaker, 3 Hill (N. Y.) 513, Clee v. Seaman, 21 Mich. 287, and Sparrow v. Kingman, 1 N. Y. 242." And again the court uses this language: "But the consequences of treating this case as an exception to the general rule are somewhat serious. If, as we hold, the defendant had the prior right to this land, it was under no obligation to treat with the plaintiff or pay him for the disturbance of his possession, which was unlawful as against the Company. Has it by this deed disqualified itself forever from asserting the right that it would have possessed had it not done this? We think not. Assuming, as some of the cases indicate, that, before disputing the title of his grantor, the grantee is bound to surrender his possession taken under the deed, such requirement is obviously inapplicable to a case like this, where the only possession consists in the disturbance of a water right or ditch claimed by the plaintiff 'by the construction of the road across such ditch. It could only be restored by the destruction of the road and the rebuilding of the ditch; in other words, by the surrender of possession under the deed, and a repudiation of the entire transaction, when it is admitted that the defendant could set up its prior title and proceed against the plaintiff as a trespasser. But this would be a useless and expensive formality; and we think the rule that forbids a tenant from disputing his landlord's title without first surrendering his possession has no application to a case like this. It may be said in general that the doctrine of estoppel exists only where there is an obligation to restore the possession of the land .upon certain contingencies, such, for instance, as exist between landlord and tenant, or mortgagor and mortgagee. In such cases the occupant is considered to have pledged his faith to return the possession of the land which he occupies, and will not be permitted to do anything to impair the title of him from whom he has received it. 3 Washb. Real Property, 98; Gardner v. Greene, 5 R. I. 104; Osterhout v. Shoemaker, 3 Hill (N. Y.) 513. In this case the defendant not only did not agree to resurrender possession to the plaintiff, but it accepted the deed with this covenant or condition for which it received no consideration, and we do not consider it a breach of good faith upon the part of the defendant to set up this fact, nor ought it to be put in a worse position by having accepted this deed and paid $250 therefor, than it would have occupied had it refused altogether to treat with the plaintiff. The deed 'was evidently delivered and received by these parties under a misapprehension of their legal rights, and it would be manifestly unjust to hold the defendant forever estopped from asserting the invalidity of the covenant into which it had inadvertently entered."

[4] What has been heretofore said in effect disposes of all of appellant's assignments of error necessary to be considered in deciding the case, except the questions of estoppel and adverse possession. About 15 years prior to the institution of this suit one Bolton, an employé of Sanborn, constructed a fence parallel with appellant's line of railway 50 feet north of the center of the track, which remained there from the time of its construction until the construction of the stock pens and stockyards. On

June 29, 1905, Sanborn conveyed a part of section 137, including the land in controversy, to the Western Stockyards Company, naming as the southern boundary line appellant's right of way. On the 6th day of February, 1909, the Western Stockyards Company conveyed to the Panhandle Packing Company a strip of land 65 feet north of and parallel with the center line of appellant's road. On the 21st day of January, 1905, appellant, acting through its vice president and general manager, entered into a contract with O. H. Nelson for the construction of the stock pens now owned by the Western Stockyards Company. Section 1 of the contract provides that "Nelson, his successors and assigns, shall within ninety days from and after the execution and delivery of these presents, build and maintain a thoroughly up to date stockyard and pens, with necessary driveways and approaches, suitable and adapted for receiving, feeding, watering, transferring, loading, unloading and reloading cattle, horses and other live stock, located according to attached blue print, marked 'Exhibit A' and made a part of this contract." The contract was also executed by the Chicago, Rock Island & Gulf Railway Company, acting through S. B. Hovey, its vice president and general superintendent, the Southern Kansas Railway Company, and the Pecos & Northern Texas Railway Company, both acting through their vice president and general manager, Avery Turner; the purpose of the contract, as expressed, being to establish such improvements at Amarillo for the mutual benefit, convenience, and use of the parties thereto. Thereafter, on the 10th day of July, 1905, by agreement of all parties, the contract was assigned to the Western Stockyards Company by the said Nelson. Again, on the 24th day of March, 1906, by mutual agreement, the life of the original contract was extended from 10 to 20 years. Section 8 of the original contract is as follows: "Said party of the first part [O. H. Nelson] further agrees to furnish sufficient ground and right of way for construction of necessary tracks for delivering and taking stock from such stockyards and pens and for other purposes in connection with operating such stockyards, such grounds and right of way to be furnished without cost to said railway companies, and the title to said railway tracks shall remain with the said railway companies and at the expiration or termination of this contract, if they decide the tracks are no longer required, they may enter in on said right of way and remove said tracks and all material belonging to said railway companies." The blue print and map referred to above and designated as "Exhibit A," and by the terms of the contract made a part thereof shows appellant's right of way to have been 18 varas wide on each side of its track, and does not include the land in controversy. The contract does not otherwise describe the land. The rule is that when a description of land, as part of a tract or survey, is general, it will be controlled by boundaries indicated on a plot or map. Cullers v. Platt, 81 Tex. 263, 16 S. W. 1003; Boggess v. Allen, 56 S. W. 195. While we do not agree with appellee that the act of appellant in accepting from Sanborn a deed to a right of way 100 feet in width across section 137 is an estoppel, the execution of this contract, with the provisions quoted above, in our opinion, is an unequivocal admission that its claim of right of way extended only 50 feet upon each side of the center of its track. A party is bound to have knowledge of its boundaries. The testimony further shows that in pursuance of the stockyards agreement Nelson and his assigns have at great expense purchased other property adjacent to the land in question, constructed extensive and expensive stockyards, packing house, constructed of brick, with its necessary machinery, all at an expense of many thousands of dollars. Sixteen feet of the packing house building is on the land in controversy, and, in addition, there are two tracks, the one entering into the property for loading and unloading produce of the packing company, together with another parallel, which have been paid for by appellees.

[5] These facts, together with the adverse possession for 15 years of Sanborn and appellees, in our opinion, make appellees' defense of estoppel in pais and limitation complete. The testimony upon these issues is practically undisputed, from which we conclude that the court did not err in peremptorily instructing a verdict for appellees. Texas, etc., Railroad Co. v. Maynard, 51 S. W. 255; Northern Pacific Ry. Co. v. Ely, 25 Wash. 384, 65 Pac. 555, 54 L. R. A. 526, 87 Am. St. Rep. 766.

The judgment is therefore affirmed.