## YOAKUM COUNTY v. SLAUGHTER.†

(Court of Civil Appeals of Texas. Amarillo. Nov. 1, 1913. On Motion for Rehearing, Dec. 6, 1913.)

1. Public Lands (§ 173*)—School Lands—Lands of State — Grant to Organize County — Statutes — Construction — Grant in Præsenti.

Act March 26, 1881 (Acts 17th Leg. c. 61), was entitled "An act to provide for designating and setting apart 300 leagues of land out of the unappropriated public domain for the benefit of the unorganized counties of the state and to provide for the survey and location of the same." Section 1 provided for the survey and platting of 300 leagues from the unappropriated public domain within the state, which should "constitute a reservation," out of which each of the unorganized counties of the state, as it might be organized, "should be entitled to four leagues of land" for free school purposes; and section 7 declared that, in case any county entitled to land under such act failed to pay surveying and patent fees within three years after its organization, it should forfeit all claims to the land "herein donated." Held, that such act, construed in connection with Const. 1876, art. 7, § 6, as amended August 14, 1883, providing that all lands granted to the several counties of the state for educational purposes are of right the property of such counties respectively to which they are granted, the title being vested in the counties, and no adverse possession or limitation shall ever be available against the county's title, constituted a grant in præsenti of the 300 leagues designated in the act, to be surveyed to the unorganized counties in the state for school purposes, which grant was irrevocable and could not be affected by subsequent legislation.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 544–551; Dec. Dig. § 173.*]

2. Public Lands (§ 173*)—Lands of State—School Lands—Beneficiaries—Unorganized County.

That a county, though created, was unorganized at the time Act March 26, 1881 (Acts 17th Leg. c. 61), was passed, providing for the survey of lands to be donated to unorganized counties for school purposes, did not preclude such county from becoming a beneficiary under the grant so as to entitle it to its portion of the land granted on its becoming organized.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 544–551; Dec. Dig. § 173.*]

3. Public Lands (§ 173*)—Lands of State—School Lands—Inconsistent Grant.

Act April 7, 1883 (Acts 18th Leg. c. 55), in so far as it attempts to grant to organized counties an interest in the original 300 leagues of land surveyed under Act March 26, 1881 (Acts 17th Leg. c. 61), and donated to unorganized counties for school purposes, is void as violative of Const. 1876, art. 7, § 6, as amended August 14, 1883, providing that lands previously granted to counties for educational purposes are of right the property of the counties to which they are granted, and, the title being vested in them, no adverse possession or limitation shall ever be available against such county, so that the act of 1883 should be construed as only applicable to the 25 additional leagues surveyed and platted under the act of 1881 which were not within the same, vesting title thereto in organized counties whose school lands had been located in conflict with older surveys or otherwise lost.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 544–551; Dec. Dig. § 173.*]

4. Public Lands (§ 173*)—School Lands—Grant to County—Right of Action.

Where a county was the owner of an undivided interest in certain land, it was entitled to maintain trespass to try title to recover the entire land as against one deraigning title from another county under a void grant.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 544–551; Dec. Dig. § 173.*]

Appeal from District Court, Tarrant County; R. H. Buck, Judge.

Action by Yoakum County against C. C. Slaughter. Judgment for defendant, and plaintiff appeals. Reversed and rendered.

Sayles, Sayles & Sayles, of Abilene, for appellant. Henry C. Coke, of Dallas, for appellee.

HALL, J. Yoakum county instituted this suit in the district court of Tarrant county against C. C. Slaughter, for the sole benefit of appellant's public schools, to recover title to, the possession of, and rents from, leagues Nos. 82, 83, and 84, and portions of leagues Nos. 81 and 85 (aggregating 17,712 acres of land) situated in Hockley and Cochran counties, alleging such leagues to be a part of the 300 leagues of land surveyed for the unorganized counties of Texas, under the provisions of an act of the Seventeenth Legislature of Texas, approved March 26, 1881 (General Laws of Texas of 1881, c. 61, p. 65), praying for the removal of cloud from its title and for the cancellation of patents to said four leagues of land; such patents purporting to have been issued by virtue of the act of the Eighteenth Legislature of Texas, approved April 7, 1883 (General Laws of Texas of 1883, c. 55, p. 45), to Shackelford county, for public school purposes, under which county the appellee, Slaughter, holds. It is alleged that Yoakum county had been created but was unorganized at the time the act of the Seventeenth Legislature, approved March 26, 1881, took effect, and at which time Shackelford county was duly organized. Appellee Slaughter answered by general demurrer, general denial, and plea of not guilty. The trial was before the court without the mediation of a jury, and judgment was rendered that plaintiff, Yoakum county, take nothing and that defendant, Slaughter, go hence without day and recover his costs.

The appellee, Slaughter, claims title under the act of 1883. The sections of the act of

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

† Writ of error pending in Supreme Court.

1881 necessary to a decision of the questions presented here are as follows:

Caption: "An act to provide for *designating* and *setting apart three hundred* leagues of land out of the unappropriated public domain *for the benefit* of the unorganized counties of the state, and to provide for the survey and location of the same:

"Section 1. Be it enacted by the Legislature of the state of Texas, that the Governor, Comptroller, Treasurer of the State, Attorney General, and Commissioner of the General Land Office, are hereby constituted a board to contract with some suitable person or persons to survey and return to the General Land Office the field notes and plats of 300 leagues of land from any of the unappropriated public domain within the state, or any of the reserves made by the act of the Legislature of July 14, 1879, which shall *constitute a reservation* out of which each of the unorganized counties of this state, as it may be organized, *shall be entitled to four leagues of land* for free school purposes."

"Sec. 5. The field notes and maps of the surveys shall be recorded in a well bound book or books by the contracting surveyor, the original of which shall be returned under oath to the General Land Office, and shall constitute an archive therein; and the said contractor or contractors shall furnish each district surveyor in whose district lands are surveyed, a copy of the field notes and maps of surveys made in his district, also recorded in a well bound book, which shall constitute a record of his office."

"Sec. 7. Each league of land shall be numbered in the order it is surveyed by the contractor or contractors, beginning at No. 1 and extending to No. 100, and as each of the unorganized counties in the state shall be organized, such county shall be entitled to the first four leagues out of the reservation authorized by this act, which shall not have been patented to other counties for free school purposes, upon the payment to the Treasurer of the State the actual costs of the surveying fees and legal interest thereon from time of payment by the state; and upon the payment of the cost of surveying and patent fees, the Commissioner of the General Land Office is hereby required to issue patents to said county for four leagues of land as above provided; provided, any county that fails to pay surveying and patent fees under this act, within three years after its organization, shall forfeit all claims to the land herein donated."

"Sec. 9. Said board shall direct the time and manner in which all plats and field notes of surveys made by the contractors under this act shall be made, one copy of which shall be deposited in the General Land Office."

So much of the act of 1883 as is necessary to be stated here is as follows:

Caption: "An act to reserve and set apart 325 leagues of land heretofore surveyed for the benefit of the unorganized counties of the state and such organized counties as may have located their four leagues of school land, or any part thereof in conflict with valid prior locations or surveys, or which may from any cause fail to get title to the four leagues of land they are entitled to under the law. Whereas, the commissioner and contractor, under an act entitled 'An act to provide for designating and setting apart three hundred leagues of land out of the unappropriated public domain, for the benefit of the unorganized counties, and to provide for the survey and location of the same,' approved March 26, 1881, have surveyed 325 leagues; and whereas, some of the four leagues of land surveyed for some of the organized counties of this state, have been located in conflict with other older surveys; and whereas, other instances of this kind may arise; therefore:

"Sec. 1. Be it enacted by the Legislature of the state of Texas: That the three hundred and twenty-five leagues of land heretofore surveyed under the provisions of an act entitled 'An act to provide for designating and setting apart three hundred leagues of land out of the unappropriated public domain, for the benefit of the unorganized counties of the state, and to provide for the survey and location of the same," approved March 16, A. D. 1882, be and the same is hereby set apart and shall constitute a reservation out of which each of the unorganized counties of this state, as it may be organized, shall be entitled to receive four leagues of land for free school purposes, and out of which such organized counties of this state, as may have located their certificate for four leagues of school land in conflict with or upon land already appropriated by valid prior location and survey, or which from any cause have failed to get title to their four leagues of school land, shall be entitled to receive so much of said land as may be necessary to secure to any such county the number of acres it may be entitled to from any cause, or that may be declared to be in conflict by the Commissioner of the General Land Office."

Section 2 of this act is identical with section 7 of the act of 1881, supra, except this provision, "But said counties shall not be required to pay patent fees for said patents," thus relieving the unorganized counties of the burden of paying the patent fees provided in section 7 of the act of 1881.

Then follows section 3: "Any organized county in this state, shall in like manner as provided in the preceding section of this act, be entitled to receive so much of said land, not exceeding four leagues, as shall be necessary to secure to any such county, the number of acres of land heretofore located by such county, and which shall be declared to be in conflict with prior locations, and surveys by the Commissioner of the General Land Office or by the decree or judgment of

any court having jurisdiction of the subject-matter. And it shall be the duty of the Commissioner of the General Land Office, upon the written application of the county judge and any two of the county commissioners, accompanied by the decision of the Commissioner of the Land Office, or a certified copy of such decree or judgment, to issue patents to such county upon the same conditions and in like manner, as is provided for unorganized counties, provided, if any such county should be entitled to receive a quantity less than one league, such land shall be surveyed at the expense of such county, in a square figure with at least two lines thereof (where more than one line is run) commencing on lines of original survey as may be selected by the county judge of the county that is entitled to the survey."

"Sec. 5. That all laws or parts of laws in conflict with this act, be and the same are hereby repealed."

As bearing upon the issues hereinafter considered, a portion of article 7, § 6, of the Constitution of 1876, as amended August 14, 1883, and which has so existed from that date, is here quoted: "All lands heretofore or hereafter granted to the several counties of this state for educational purposes are of right the property of said counties respectively to which they were granted, and title thereto is vested in said counties, and no adverse possession or limitation shall ever be available against the title of any county." The amendment of August 14, 1883, made no material change in this clause of the article, as it existed in the Constitution of 1876. It is shown by the record that the locating surveyor or contractor under the act of 1881, who was directed to return field notes for 300 leagues of land, for some reason unexplained, returned the field notes for 25 additional leagues. Twenty-five of the 325 leagues so returned had been patented to counties which were organized before the act of 1881 took effect, prior to the issuance of patents to the organized county of Shackelford, for the four leagues in controversy. Appellant's theory of this case is that the counties created but unorganized prior to the act of 1881, or afterwards created, and necessarily then unorganized, are entitled to the original 300 leagues, and that a proper construction of the act of 1883 disposed of only the additional 25 leagues, which had been surveyed under the act of 1881, and presents two issues based upon article 7, § 6, of the Constitution of 1876, supra, as follows: "First. That if said act of 1883 purports to either expressly or impliedly repeal the act of 1881, then the act of 1883 is unconstitutional and void in contravening the provisions of the Constitution of the United States and of this state that no law shall be passed impairing the obligation of a contract or depriving any person of property without due process of law or denying any person the equal protection of the laws.

Second. There is no conflict between said acts of 1881 and 1883. That the said act of 1883 does not expressly or impliedly repeal the former act, which makes a final disposition of the original 300 leagues to unorganized counties, and said act of 1883 makes a final disposition only of the 25 additional leagues of land to organized counties."

Appellant's first assignment of error is: "The court erred in finding in his second finding of fact that it was not the intention of the Seventeenth Legislature of Texas, by its act approved March 26, 1881, to vest title in plaintiff to the land sued for. In concluding as a matter of law that plaintiff had no vested right to such lands, and that defendant, Slaughter, is entitled to a judgment, and, in rendering judgment for defendant, Slaughter, for the reason that said act of the Seventeenth Legislature of Texas is a grant in præsenti to plaintiff of said four leagues of land, the obligation of which grant could not be impaired by the subsequent act of the Eighteenth Legislature of Texas, approved April 7, 1883, because of the provisions of article 1, § 10, subd. 1, of the Constitution of the United States of America, and article 1, § 16, of the Constitution of Texas."

Appellant's first and second propositions under this assignment insist that the act of 1881 is a grant in præsenti to Yoakum county. The following statement under these propositions, in substance, is taken from appellant's brief:

The trial court found that it was not the intention of the Legislature, under this act, to vest title in unorganized counties to the 300 leagues of land, and concluded as a matter of law that appellant, prior to its organization in 1907, had no vested right to any portion of said land. Appellant was created as a county by the Legislature, August 21, 1876, and its existence as a county has continued ever since. It was sparsely settled and was not organized until on or about the month of October, 1907. No land has ever been patented to it for public school purposes under any act of the Legislature. The provisions of the act of 1881, pointing out the manner in which the leagues therein mentioned should be surveyed and numbered, and requiring that field notes and maps thereof should be recorded and returned to the Land Office and copies furnished to the several district surveyors, were all complied with in 1882, prior to the passage of the act of 1883, and prior also to the issuance of any patent for any part of the land so surveyed. The locating surveyor or contractor also located and returned the field notes of 25 "supernumerary" leagues, which he numbered from 1 to 25, inclusive. The 300 leagues provided for in the act he numbered 1 to 300, inclusive. The book containing the original notes of the 325 leagues was filed in the General Land Office at Austin, August 31, 1882, and is designated "Un-

organized County School Land Record" and is now an archive in that office. The numbers of those 25 "supernumerary" leagues were by the Commissioner of the General Land Office crossed out and said leagues numbered from 301 to 325, inclusive, as directed by the act of 1883. The three maps returned by the locating surveyor, are designated "Plattes of the Unorganized County School Land in the Districts of Young, Baylor and Palo Pinto."

Within three years after its organization, plaintiff requested and made demand in writing of the Land Commissioner to issue patents to it for the four leagues of land out of said 300 leagues (not out of said 25 supernumerary leagues) to which it claimed to be entitled for school purposes, and in said written request and demand stated that, if the Land Commissioner refused said request and demand, then said request and demand should apply to the land described in plaintiff's amended original petition and tendered to said Commissioner in legal tender the patent fees for the land sued for, and tendered to the State Treasurer the actual costs of surveying fees for said land and legal interest thereon, both of which sums tendered are now in possession of said state officers. The Land Commissioner refused to comply with the demand, stating that all of said 325 leagues had theretofore been patented to other counties in Texas. The lands described in plaintiff's amended original petition are a portion of said 300 leagues of land. The original field notes of each of said 325 leagues of land recite: "Field notes of a survey of 4,428 acres (1 league) of land, made for the state of Texas, under contract with the state, by authority of an act of the Seventeenth Legislature, entitled 'An act to provide for designating and setting apart 300 leagues of land out of the unappropriated public domain, for the benefit of the unorganized counties of the state, and to provide for the survey and location of the same.' There were 60 counties in Texas which had been created but unorganized when the said act of 1881 took effect, and there have been 24 counties created and organized, and one county created but never organized, since that time. The land sued for, described in plaintiff's·pleadings, had never been patented to a county which was created but unorganized when said act of 1881 took effect, nor to a county afterwards created.

[1] We think the words, "designating and setting apart," "for the benefit of the unorganized counties," appearing in the caption of said act, and the statement that the failure on the part of any county to comply with certain requirements thereof, shall forfeit its claim to "the land here donated," appearing in section 7, when construed in the light of article 7, § 6, Constitution of 1876, supra, evidence a grant in præsenti

to appellant and all other unorganized counties of the 300 leagues designated. In M., K. & T. Ry. Co. v. Mahaffey (Sup.) 150 S. W. 881, Chief Justice Brown said that the title or caption of an act is a part of the law and must be considered in construing it. From the days of the republic it has been the policy of a Congress and subsequent Legislature to donate lands toward promoting the educational interests of the people, and these donations have been enjoined upon Congress and the Legislatures by various constitutional demands. A consideration of these various acts and their effect and purpose as construed by subsequent constitutional provisions is, we think, of great force in determining the effect of the act in question. The Constitution of the republic of Texas of 1836, section 5, is as follows: "It shall be the duty of Congress, as soon as circumstances will permit, to provide by law a general system of education." In obedience to this injunction the Congress of the republic on January 26, 1839 (Laws 1839, p. 120) passed the following law, entitled

"An act appropriating certain lands for the establishment of a general system of education:

"Section 1. Be it enacted by the Senate and House of Representatives of the republic of Texas, in Congress assembled, that each county of this republic shall have three leagues of land surveyed and set apart for the purpose of establishing a primary school or academy in said county, which said land shall be located and surveyed by the county surveyor or his deputy in each county, and be paid the fees now allowed under the land law out of the county treasury: Provided, there is that quantity of good vacant land in the counties. * * *·

"Sec. 2. Be it further enacted, that where there is not a sufficient quantity of good land that is vacant in any county, the county court of such county or counties shall be and they are hereby empowered and required to have surveyed · upon any of the vacant lands of this republic, said quantity of land," etc. The Constitution of 1845, which is the next Constitution adopted after the enactment of the above law, contains in article 10, the following sections:

"Sec. 3. All public lands which have been heretofore, or may hereafter be, granted for public schools to the various counties, or other political divisions in this state, shall not be alienated in fee, nor disposed of otherwise than by lease for a term of not exceeding twenty years, in such manner as the Legislature may direct.

· "Sec. 4. The several counties in this state which had not received their quantum of lands for the purposes of education shall be entitled to the same quantity heretofore appropriated by the Congress of the republic of Texas, to other counties."

Thereafter on January 16, 1850, the state Legislature passed the following:

"An act making additional appropriations of land for the purpose of education.

"Sec. 1. Be it enacted by the Legislature of the state of Texas that each and every county in this state, which has been established and organized since the 16th day of February, in the year 1846, or which may hereafter be established and organized by law, shall have surveyed and set apart four leagues of land for the purposes of education, which locations and surveys may be made upon any vacant and unappropriated lands within the limits of the state.

"Sec. 2. Be it further enacted, that the lands so donated, shall be located and surveyed in conformity to an act entitled 'An act appropriating certain lands for the establishment of a general system of education,' approved January 26, 1839, and the provisions of the same shall apply to the lands when so located."

Following these enactments, the Constitution of 1861 was adopted; sections 3 and 4 of article 10 being identical with sections 3 and 4 of article 10 of the Constitution of 1845, supra. The Constitution of 1866, article 10, §§ 6 and 11, referred to the school lands which had been granted to counties, as follows:

"Sec. 6. All public lands which have been heretofore, or may be hereafter, granted for public schools to the various counties or other political divisions in the state shall be under the control of the Legislature, and may be sold on such terms and under such regulations as the Legislature shall by law prescribe, and the proceeds of the sale of said lands shall be added to the perpetual school fund of the state."

"Sec. 11. The several counties in this state which have not received their quantum of the lands for the purposes of education shall be entitled to the same quantity heretofore appropriated by the Congress of the republic of Texas (and the state) to other counties; and the counties which have not had the lands to which they are entitled for educational purposes located shall have a right to contract for the location, surveying, and procuring patents for said lands, and paying for the same with any portion of said lands so patented, not to exceed one-fourth of the whole amount to be so located, surveyed, and patented, to be divided according to quantity, allowing to each part a fair proportion of land, water and timber."

Following this the Constitution of 1869, art. 9, § 8, is:

"The public lands heretofore given to counties shall be under the control of the Legislature, and may be sold under such regulations as the Legislature may prescribe; and in such case the proceeds of same shall be added to the public school fund."

In 1875 (Laws 1875, c. 86) the Legislature passed the following law:

"An act to grant lands to certain counties for educational purposes.

"Section 1. Be it enacted by the Legislature of the state of Texas, that all organized counties in this state, which have not received a grant of lands for purposes of education, and all counties hereafter created, shall be entitled to have issued to each of them certificates for four leagues of land, to be located anywhere on the unappropriated public domain of this state.

"Sec. 2. Upon the application of the county court of any such county, the Commissioner shall issue to said county four certificates, for one league of land each, which may be located, surveyed and patented in the same manner as lands granted to other counties have been, and said counties shall pay no office fees in the General Land Office."

In the General Laws of 1879, p. 150, we find the following enactment: "That the proceeds of any leasing or renting of lands heretofore granted by the state of Texas to the several counties for educational purposes, and the proceeds arising from any sale of timber on said lands or any part thereof, shall be applied exclusively to the purposes of public education in said counties respectively, and shall be invested in a like manner as the Constitution and laws require of proceeds of sales of said land," etc.

In construing the act of 1881, in Holmes v. Robison, 124 S. W. 629, the Supreme Court said: "We think it plain that the leading purpose of the act was not so much to provide for particular counties as it was to preserve the means with which to carry out the established policy with reference to all counties. The organized counties either had received their lands, or could do so without delay; such as needed further protection were eventually provided for. The other class, those which were not in a situation to receive grants at once, were the ones for whose benefit a reservation was needed, and this necessity existed with reference to all that were to organize in the future, to those that were both to be created and organized as well as to those that were only to be organized." Texas has had no unappropriated public domain since 1900, and the fact was within the knowledge of the Legislature that the domain of Texas was being rapidly taken up through the various methods which had been provided for locating and appropriating the public lands, and we are not willing to believe that in the enactment of this law of 1881 the Legislature undertook to change the policy which had been followed from the days of the republic in setting aside lands for the benefit of the schools of the respective counties and make a bare designation of lands rather than an absolute grant, as had been the custom of former Legislatures. The construction placed upon the former acts of

the lawmaking bodies of the state and of the republic by the constitutional conventions, styling them grants, is persuasive, if not conclusive, of the effect of such acts.

In construing the acts of 1839 and 1850, supra, and the above-quoted provisions of the Constitutions of 1836 and 1845, in the case of Milam County v. Bateman, 54 Tex. 153, Bonner, A. J., uses this language: "It has been decided by this court that a valid location or survey of land is a vested right, and that the Legislature does not retain the absolute disposition of the land until the patent issues. * * * Section 5, Gen. Prov., Constitution of the republic, required that Congress, as soon as circumstances would permit, should provide by law a general system of education. Accordingly, the act of January 26, 1839, was passed, donating for a general system of education three leagues of land to each county, which by the act of January 16, 1850, was increased to four leagues; requiring the counties to have the same 'surveyed and set apart' at their own expense. Paschal's Digest, arts. 3464, 3468; Wilcox v. Jackson, 13 Pet. 498 [10 L. Ed. 264]. Section 4, art. 10, Constitution of 1845, provided 'that the several counties in this state which have not received their quantum of lands for the purposes of education, shall be entitled to the same quantity heretofore appropriated by the Congress of the republic of Texas to other counties.' In Bell County v. Alexander, 22 Tex. 363 [73 Am. Dec. 268], it is said that this recognized and confirmed the grants of school lands made by the above statutes."

In Fannin County v. Riddle, 51 Tex. 360, the same judge said: "It has been the policy of Texas, both as a republic and as a state, to encourage education by a liberal donation from her magnificent public domain, and to preserve and give direction to the same by judicious legislation. By the above act of January 26, 1839, 50 leagues of land were set apart as a university fund, and each county was entitled to have three leagues surveyed for the benefit of a general system of education. This, by subsequent legislation, was increased to four leagues. So guarded was the state to protect these lands and to place them on a different tenure from those held by individuals, that by the act of August 30, 1856 (Laws 1856, c. 158) it was provided that no statute of limitations should run in favor of any one who had theretofore settled, or might thereafter settle, upon the same. This salutary provision was subsequently incorporated into the organic law of the state. * * * These lands were intended for the wise purpose of public education, which, by the Constitution of 1876, is declared to be essential to the preservation of the liberties and rights of the people. The counties are the mere trustees to carry out this purpose, and the lands are given to them, not to divest the body politic of their control and benefit, but for the purpose of convenience of designation and distribution. This is evident from the jealous protection and direction which the people have exercised over them in their several organic and legislative enactments. At the time of the institution of this suit, by express provision of the Constitution then in force, the public lands before given to counties were under the control of the state through the Legislature. * * * It is held in Kuechler v. Wright, 40 Tex. 600, that the alternate or even numbered sections of land reserved for the use of the state, by the act incorporating the Memphis, El Paso & Pacific Ry. Co., and which by section 3 of article 10 of the Constitution of 1866 was set apart for a perpetual school fund, had thereby been placed beyond the power of the Legislature to divert to any other purpose."

The effect of the act of 1839 as a grant seems to have been settled in the affirmative by the Supreme Court in the case of Talley v. Lamar County, 104 Tex. 295, 137 S. W. 1125, in which Dibrell, A. J., says: "The most important question presented for settlement is that in regard to the superior rights of the parties to this suit accruing to them from the several legislative grants and provisions of the law regulating the location and return of the field notes of such grants and the issuance of patents thereon. The right of Lamar county to the acquisition of four leagues of land for the benefit of its public schools, of which the land in controversy is a part, was given by the acts of January 26, 1839, and January 16, 1850; * * * the first act granting three leagues of land, and the second one league additional. This grant of land to the several counties was in response to the general provisions (section 5) of the Constitution of the republic, and subsequently recognized and confirmed by the Constitution of 1845, § 4. * * * It seems to be pretty well settled in this state that, where the government makes an appropriation of land for some particular use and a tract of such land is in conformity with such appropriation separated from the mass of the public lands by a survey or other appropriate acts of segregation, the title to such land becomes a vested right, which may not be impaired or lost by abandonment, unless other lands are secured in its stead. That is, to say, the mere declaration, intention, or determination to abandon the location and survey thus made would not be effective as to the right of a county to its school land, unless the county had received an equal amount in lieu of that abandoned."

It occurs to us that these authorities are sufficient to authorize us to construe the act of 1881, which uses language even stronger than either the act of 1839 or 1850, as a grant in præsenti. This position is sustained also by the decisions of the United States Supreme Court, and of the federal courts. In St. Paul & Pacific Ry. Co. v. Northern Pacific Railway Co., 139 U. S. 1, 11 Sup. Ct. 389, 35 L. Ed. 77, it is said: "The route (of

the railroad) not being at the time determin-ed, the grant was in the nature of a float, and the title did not attach to any specific sections until they were capable of identifica-tion; but, when once identified, the title at-tached to them as of the date of the grant. * * * It is in this sense that the grant is termed one in præsenti. * * * This is the construction given to similar grants by this court, where the question has been often con-sidered. Indeed, it is so well settled as to be no longer open to discussion. * * * It is contended that they are qualified, and re-stricted by the provisions of the fourth sec-tion, that whenever 25 miles of railroad was completed in a good, substantial, and work-manlike manner, and the commissioners ap-pointed to examine the same have made a report to that effect to the president, patents shall be issued 'confirming to said company the right and title to said lands, situated op-posite to, and coterminous with, said com-pleted section of said road.' This provision, it is urged, is inconsistent with the theory that a title to the lands had previously vest-ed in the company. We do not think so." To the same effect are the following cases: U. S. v. Detroit T. & L. Co., 200 U. S. 321, 26 Sup. Ct. 282, 50 L. Ed. 499; Langdeau v. Hanes, 21 Wall. 521, 22 L. Ed. 606; Wright v. Rose-berry, 121 U. S. 488, 7 Sup. Ct. 985, 30 L. Ed. 1039; Jones v. Meehan, 175 U. S. 1, 20 Sup. Ct. 1, 44 L. Ed. 49; Schulenberg v. Harri-man, 21 Wall. 44, 22 L. Ed. 551; Dartmouth College v. Woodward, 4 Wheat. 518, 4 L. Ed. 629. Some of the above authorities and oth-ers were discussed by us in F. W. & D. C. Ry. Co. v. Western Stockyards Co., 151 S. W. 1172, and its companion case, and a writ of error was refused by the Supreme Court in the former cause.

[2] Appellee contends that, appellant being an unorganized county when the act of 1881 became operative, it was not a legal entity and had no such existence in law as would enable it to become a beneficiary under a grant. This question is settled adversely to appellee's contention in Holmes v. Robison and Milam County v. Bateman, supra, and its ownership of the land or interest therein is expressly recognized by the Legislature in the Acts of 1884, p. 57.

[3] The next point for our consideration is the effect of the act of 1883, in so far as it attempts to grant to organized counties in the state an interest in the original 300 leagues surveyed under the act of 1881. In Fannin County v. Riddle, supra, citing Kuechler v. Wright, 40 Tex. 600, the court, without equivocation, announced the rule that the provisions contained in the Consti-tutions of 1866 and 1869 placed beyond the power of the Legislature the right to divert for any other purpose lands once granted for county school purposes, and said: "The appropriation of the school lands was made by direct grant of the government, the high-est character of title. They were set apart

to a particular use, and would not by intend-ment be construed to have been within the terms of a subsequent act, by which a dif-ferent appropriation was made. * * * It is believed that a very different rule should prevail in a case of this character from that which would obtain between individuals, and that the reasons which prompted the pas-sage of the act in question did not apply to the lands thus held in trust for the people of the state for the use and benefit of the public schools." Again, the same judge, in Milam County v. Bateman, supra, said: "Counties in their relation toward the state may be viewed in a twofold aspect: One, which pertains to their political rights and privileges; and, the other, to their rights of property. Over the former, the Legislature, as the representative of state sovereignty, can exercise absolute power unless restricted by the organic law. If it could not exercise such power over delegated political rights and privileges of counties, which are sub-divisions of state governmental authority, we might have a system of petty discordant governments within a government, without unity of design or action. * * * A dif-ferent principle, however, obtains as regards the rights of counties to property which they may acquire. Such rights, as a general rule, are protected by the same constitutional guarantees which shield the property of in-dividuals. * * * Even though the state itself may have donated the property, it thereby becomes such vested right as will be protected. * * * If given for a specif-ic object, the state may very properly, as in the instance under consideration of our school lands granted to counties, exercise such supervision and control over the actions of the counties as to compel the proper exe-cution of the trust, or prevent its being de-feated; but it is believed that this control, unless by the consent of the county, should be subject to the restriction that the purpose for which the property was originally ac-quired shall, as far as the circumstances will admit, be kept in view, and that it shall not arbitrarily be diverted, as in the case before us, to private parties and to a wholly differ-ent purpose. * * * In relation to these school lands, the county, though agents for the state, may be compared to agencies cou-pled with an interest, which cannot be revok-ed at the pleasure of the principal. * * * Here the question in this connection is: If the existing county of Milam had acquired the right to the lands in controversy, for public educational purposes, under a consti-tutional and statutory right common to all the counties of Texas, could the state, by the legislative act of July 21, 1870 (Laws 1870, c. 21), arbitrarily take from the county this land and give it to private parties and for private purposes? That the state could not do this, because it would impair a vested right, we think beyond question."

The case of Grogan v. San Francisco, 18

Cal. 590, considers a grant made by the state of California in 1851, to the city of San Francisco, whereby the city was given the use of certain property for a period of 99 years. It subsequently sold a portion of the property, and before payment of the purchase price a statute was enacted providing that such payment or portion thereof might be made in appropriate indebtedness due the city commonly designated as "city scrip," and this scrip was required to be received at its par value, which was about 90 cents greater than its market value at that time. In denying the right of the Legislature to thus interfere, Chief Justice Field, speaking for the Supreme Court, said: "The estate, having vested in the city, ceased to be subject to the legislation of the state, except to the same extent that all property is thus subject. It could not be afterwards divested by the state, or by any proceedings instituted by her direction. 'A law' says Mr. Chief Justice Marshall, 'annulling conveyances between individuals, and declaring that the grantors should stand seised of their former estates, notwithstanding those grants, would be as repugnant to the Constitution as a law discharging the vendors of property from the obligation of executing their contracts, by conveyances.' Fletcher v. Peck, 6 Cranch, 87 [3 L. Ed. 162]. And between a law thus annulling the conveyances, and a law directing the execution of conveyances to third parties of the estate granted, without the consent of the grantees, it is not perceived that there is any substantial difference. The law might as well provide that third parties should possess the estate, and direct the mode of its transfer to them, as to declare that the original grantors should stand seised of the same. Nor is there any difference in inviolability of the contract between a grant of property to an individual and a like grant to a municipal corporation. So far as municipal corporations are invested with subordinate legislative powers for local purposes, they are mere instrumentalities of the state for the convenient administration of the government, and their powers are under the entire control of the Legislature; they may be qualified, enlarged, restricted, or withdrawn at its direction. But these bodies, says Kent, 'may also be empowered to take and hold private property for municipal uses, and such property is invested with the security of other private rights.' * * * 'It may also be admitted,' observes Mr. Justice Story, in his opinion in the case of the Trustees of Dartmouth College v. Woodward, 4 Wheat. 518 [4 L. Ed. 629], that corporations for mere public government, such as towns, cities, and counties, may in many respects be subject to legislative control. But it will hardly be contended that, even in respect to such corporations, the legislative power is so transcendent that it may, at its will, take away the private property of the corporation or change the uses of its private funds acquired under the public faith. 'The inhabitants of the city of New York,' says the Supreme Court of New York, 'have a vested right in the city halls, markets, waterworks, ferries, and other public property, which cannot be taken from them any more than from individual dwellings or storehouses. Their rights, in this respect, rest not merely upon the Constitution, but upon the great principles of eternal justice which lie at the foundation of all free governments.' * * * The authorities are all to the same purport. A legislative grant is an executed contract, and as such is within the clause of the Constitution of the United States which prohibits the state from passing any law impairing the obligation of contracts. This was expressly decided by the Supreme Court of the United States, in Fletcher v. Peck, 6 Cranch, 87 [3 L. Ed. 162]. It cannot therefore be destroyed, and the estate be divested by any subsequent legislative enactment. And though a municipal corporation is the creature of the Legislature, yet, when the state enters into a contract with it, the subordinate relation ceases, and that equality arises which exists between all contracting parties. And however great the control of the Legislature over the corporation, it can be exercised only in subordination to the principle which secures the inviolability of contracts." To the same effect we might quote from Wolff v. New Orleans, 103 U. S. 358, 26 L. Ed. 395; State of New Jersey v. Wilson, 7 Cranch, 164, 3 L. Ed. 303; Davis v. Gray, 16 Wall. 203, 21 L. Ed. 447; Terrett v. Taylor, 9 Cranch, 43, 3 L. Ed. 650; Town of Pawlet v. Clark, 9 Cranch, 292, 3 L. Ed. 735.

Of course, if the act of 1883 contravenes the Constitution of the United States, art. 1, § 10, it is also condemned by article 1, § 16, of the Constitution of Texas. We do not want to be understood, however, as holding that the entire act of April 7, 1883, is void. Our holding is that it is void in so far as it attempts to confer upon the organized counties of the state any right to the original 300 leagues of land. The additional 25 leagues, field notes of which had been returned by the surveyor, who made the original survey under the act of 1881, had not been disposed of by said act, and it was within the power of the Eighteenth Legislature to make final disposition of said 25 leagues. This we think it did by vesting title thereto in the organized counties, whose school lands had been located in conflict with older surveys or otherwise lost. In Holmes v. Robison, supra, these acts are construed together, and under the authority of Conley v. Daughters of the Republic, 156 S. W. 197, it is our duty to give both acts effect in so far as their provisions do not conflict; but, where there is a conflict, the act of 1883 cannot be construed as repealing the act of 1881. Appellee suggests that because the Commissioners of the General Land Office, for more than a quarter of a century, have construed the two acts

as contended for by appellee, and because the act of 1883 has alone been incorporated in the permanent statute by the codifiers of 1895, our decision of this controversy should be accordingly shaped. In our opinion, if the Land Commissioners and codifiers have so construed the two acts in question, such construction is radically wrong, and the sooner it is corrected the better.

[4] The only remaining proposition which we consider necessary in the final disposition of this appeal is the right of Yoakum county suing alone to recover the land in question from the appellee, Slaughter. Slaughter's title is deraigned from Shackelford county, and since the patents issued to Shackelford county were illegal, and since appellant has such an undivided interest in the land sued for as will support an action in trespass to try title, under the rule announced in the following cases, appellant will be held entitled to recover the entire land as against the appellee: Murrell v. Wright, 78 Tex. 519, 15 S. W. 156; Pilcher v. Kirk, 55 Tex. 208; Robertson v. Johnson, 57 Tex. 63; Contreras v. Haynes, 61 Tex. 103; Gaither v. Hanrick, 69 Tex. 92, 6 S. W. 619; Carley v. Parton, 75 Tex. 98, 12 S. W. 950; Jett v. Hunter, 51 Tex. Civ. App. 92, 111 S. W. 176.

We have carefully reviewed all the assignments, propositions, and counter propositions contained in the briefs of the parties, and believe that the conclusions at which we have arrived in considering the propositions heretofore discussed render the consideration of the remaining assignments unnecessary.

Believing there was error in the judgment of the trial court, it is reversed and here rendered for appellant, Yoakum county.

On Motion for Rehearing.

Appellee requests the court to find additional facts agreed to and set out in the statement of facts, as follows, and which appellee insists are material. We have granted that part of the motion, and, in accordance with the statement of facts, find as follows:

First. Patents were issued to parts of the 325 leagues of land to counties in Texas, which were created but unorganized at the time of the act of the Seventeenth Legislature of Texas, approved March 26, 1881, took effect, as follows: Leagues and parts of leagues Nos. 17, 18, 19, 20, 13, 14, 15, 16, 9, 10, 11, 12, 1, 2, 3, 4, 5, 6, 7, 8, 37, 38, 35, 36, west part of 45, 2,533 acres of 46, 47, 48, 1,895 acres of the north part of 49, 2,533 acres of the south part of 49, 50, 51, 52, 1,895 acres of the east part of 53, 2,063 acres of the north part of 57, 58, 59, 60, 2,365 acres of the south part of 61, 2,063 acres of the east part of 65, 66, 67, 68, 2,365 acres of the west part of 69, 2,063 acres of the north part of 73, 74, 75, 76, 2,365 acres of the north part of 77.

Patents were issued to parts of said 325 leagues to counties in Texas which were created after said act of 1881 took effect, as follows: Leagues and parts of leagues Nos. 62, 2,063 acres of the north part of 61, 63, 64, 2,365 acres of the west part of 65, 2,063 acres of the east part of 69, 70, 71, 72, 2,365 acres of the south part of 73, 2,063 acres of the south part of 77, 78, 79, and 80.

The following parts of said 325 leagues of land were patented to counties in Texas, which were organized at the time said act of the Seventeenth Legislature of Texas took effect, and to O. E. Flato: Leagues or parts of leagues Nos. 322, 323, 324, 325, 26, 1,548 acres of the south part of 27, 30, 31, 32, 33, 34, 20, 22, 23, 24, 1,663 acres of. the northwest part of 27, 28, 54 acres of the north part of 29, 39, 41, 1,214 acres of the south part of 42, 40, 960 acres of the east part of 42, 2,254 acres of the northwest part of 42, 43, 44, 1,895 acres of the east part of 45, 2,533 acres of the west part of 53, 54, 55, 56, 1,895 acres of the south part of 57, 470 acres of the middle part of 57, 366 acres of the north part of 29.

The following leagues have been patented to the counties named since July 29, 1866: Leagues and parts of leagues numbered as follows: 2,941 acres of the east part of 321, July 7, 1892, to Rusk county; 1,000 acres, middle part of 321, September 29, 1892, to Wheeler county; 584 acres, north middle part of 205, September 30, 1903, to Collin county; 1,546 acres, southwest part of 205, October 21, 1904, to Walker county; 739 acres, northwest part of 212, August 22, 1906, to Blanco county; 515 acres, south middle part of 205, November 17, 1906, to Lamar county.

Second. All of said 25 additional leagues, numbered from 301 to 325, inclusive, have been patented to unorganized counties, and none of them patented to counties which were organized when the act of 1881 took effect, except leagues 322, 323, 324, 325, and 3,941 acres of league 321.

Third. The whole of said 325 leagues had been patented prior to the bringing of this suit as follows: To 18 counties created after the act of 1881 took effect, taking four leagues each, aggregating 72 leagues; to counties which were organized when the act of 1881 took effect, 37 leagues, and a fraction, and the balance, consisting of 215 and a fraction leagues, with some exception not material to be stated, by counties which had been created but were unorganized when the act of 1881 took effect.

Fourth. Shackelford county was created by act of the Legislature February 1, 1858, and organized on or about September 12, 1874. July 9, 1875, the Commissioner of the General Land Office issued to Shackelford county four school land certificates for one league each, said certificates being numbered 1, 2, 3, and 4, respectively. These certificates were located in Motley county in 1875, and the field notes returned to the Land Office December the same year, and the four leagues patented to Shackelford county in June, 1877. It subsequently developed that

said four leagues were entirely covered by older and valid surveys. The patents therefor were returned to the Land Office and canceled July 6, 1886, for that reason. On July 29, 1886, the four leagues of land in controversy in this cause were patented to Shackelford county; the patent reciting that they were issued by virtue of an act of the Legislature of the state of Texas, approved April 7, 1883.

Fifth. Shackelford county has never received any land for school purposes except the four leagues in controversy herein, except the four leagues in Motley county above mentioned, the patents to which were canceled. On May 14, 1900, Shackelford county sold the lands in controversy to one Oxsheer, partly on credit and partly for cash. On June 6, 1900, Oxsheer conveyed the land to appellee, C. C. Slaughter, partly for cash and the balance by the assumption by the said Slaughter of the remainder of the purchase price due the county, and Slaughter went into possession of the lands. He thereafter paid the balance of the purchase price owing the county, and on August 12, 1908, the county conveyed the land to him. The sale and conveyance by Shackelford county complied with the laws governing sale by counties of their school lands and were the acts of the commissioners' court of Shackelford county.

The motion for rehearing is in all things else overruled.