YOAKUM COUNTY, BY W. HOLMES, COUNTY JUDGE, v. J. T. ROBISON, COMMISSIONER OF THE GENERAL LAND OFFICE, ET AL.

No. 2060. Decided February 2, 1910.

**1.—County School Land—Unorganized County.**

The Act of March 26, 1881 (Laws 17th Leg., p. 65) providing for setting aside and surveying certain lands for the benefit of "each of the unorganized counties of the State as it may be organized,, was not intender to restrict such donations to the counties already created by law but not yet organized. A patent of lands reserved and surveyed under such Act to a county not existing at the time of its passage, but subsequently created and organized, conveyed title as against the claim thereto asserted later by a county existing but unorganized when the Act was passed. (P. 149).

**2.—Same—Statutory Construction.**

The general policy of the State as manifested in its legislation in regard to county school lands; the lack of reason for discriminating between existing unorganized counties and those to be created in the future; the creation of a reservation and survey of greater extent than necessary if the latter class were not to share in the benefits; the vast size of some then existing counties; the striking out by the Legislature of the word "present" before the words "unorganized counties" from the caption of the bill; the construction placed on the law by executive officers, are considered in determining the construction of the Act of March 6, 1881. (Pp. 147-150).

Original application to the Supreme Court for writ of mandamus against the Commissioner of the General Land Office.

*James & Yeiser,* for relator.—Counties created subsequently to the passage of the Acts mentioned in relator's second proposition were not entitled to any lands out of the reservation created by said Acts, and the action of the several Commissioners of the General Land Office and Governors of the State of Texas in issuing patents to such counties to lands situated in said reservation was without authority of law and the patents issued are absolutely void. Day Ld. & Cattle Co. v. State, 68 Texas, 540.

*Jewell P. Lightfoot,* Attorney-General, and *L. A. Dale,* Assistant, for respondent.

*Hill, Lee & Hill,* for Coke County, respondent.

*Morrow & Smithdeal,* for respondent, Simmons.

MR. JUSTICE WILLIAMS delivered the opinion of the court.

This is an application in behalf of Yoakum County for a mandamus to compel the Commissioner to issue to the county, for its school fund, patents for four leagues of land. Coke County and certain individuals are made parties as claimants of the land. The refusal to issue the patents is based upon the fact that the same land has been patented as school land to Coke County, by which it has been sold to other parties under whom the other corespondents claim.

The question arises under the Acts of March 26, 1881, (p. 65), and that of April 7, 1883, (p. 45).

It is asserted by relator that those Acts reserved from the public domain, with which to supply the school lands to the unorganized counties which had previously been established and were then existent, of which Yoakum County was one, the three hundred leagues for the surveying and setting apart of which provision was made by the first named Act, so that no part thereof could lawfully be granted by the officers of the State to counties subsequently created and organized, as was Coke County, to constitute their school lands; and that, hence, the patents to Coke County are nullities and constitute no bar to the selection and appropriation of the land embraced in them by Yoakum County.

The position of all the respondents is that the laws referred to had no such effect, but that they set apart the lands for appropriation as well by counties to be created and organized after the enactment of the statutes as by those then having legal existence, but unorganized.

The Act of 1881, as passed, was entitled: "An Act to provide for designating and setting apart three hundred leagues of land out of the unappropriated public domain for the benefit of the unorganized counties of the State and to provide for the survey and location of the same." Its first section provided for the survey of three hundred leagues "which shall constitute a reservation out of which each of the unorganized counties of this State, as it may be organized, shall be entitled to four leagues for school purposes."

Section 7 is as follows:

"Each league of land shall be numbered in the order it is surveyed by the contractor or contractors, beginning at number one and extending to number one hundred, and as each of the unorganized counties of the State shall be organized, such county shall be entitled to the first four leagues out of the reservation authorized by this Act, which shall not have been patented to other counties for free school purposes, upon the payment to the treasurer of the State the actual costs of the surveying fees and legal interest thereon from time of payment by the State and upon the payment of the cost of surveying and patent fees, the Commissioner of the General Land Office is hereby required to issue patents to said county for four leagues of land as above provided; provided, any county that fails to pay surveying and

patent fees under this Act, within three years after its organization, shall forfeit all claims to the lands herein donated."

The Act of 1883 recited that three hundred and twenty-five leagues had been surveyed under the Act of 1881, and that the surveys of four leagues of school land previously made for some of the organized counties conflicted with older surveys, and provided for the satisfaction out of these three hundred and twenty-five leagues of counties so situated as well as of the unorganized counties as before. Further statement of the provisions of this Act is unnecessary, since it is not contended, and we can not see that there is anything in them to make the question before us different from what it would be under the Act of 1881 alone.

It must be admitted that the construction of counsel for relator is readily and naturally suggested by the language of the Act last mentioned.

When it was passed, some of the counties were organized, and some were unorganized, but all had legal existence. The phrase, "the unorganized counties of the State," if there were nothing to modify its meaning, would seem to refer to those which were in existence and thus known. Undoubtedly the language does refer to and include them, but the question is, does it discriminate between them and counties afterwards to be established and organized? Was it really the legislative purpose that the mere fact that parts of the territory of the State had been segregated from the rest, by boundaries, and had received names, as counties, should give them a preference over others, afterwards to be established, in the enjoyment of the provision for the support of free schools which the constant policy of the Republic and of the State had extended to every county as it came into existence and established a county government? It is easy to see why the Legislature would reserve from the rapidly diminishing public domain lands with which to continue the established policy of the State. The reason is also plain why a reservation would not be made for the benefit of organized counties further than was done. They had already received their lands or were in a condition to receive them at once. But it was important to save from the impending exhaustion of the public land some with which eventually to supply those counties which could not otherwise be provided for at once; and this consideration was as cogent with reference to counties to be created and organized later as with reference to those already created but unorganized. No reason can be seen why the Legislature would consciously include one class and exclude the other class from the benefits of the provision made.

There is nothing in the previous legislative history, nor in the nature or language of this particular provision, but the mere use of the phrase above quoted, to suggest that such a discrimination would purposely be made. From the time when the municipalities, with their vast territories, were constituted the first counties, the Legislature had, as the settlement of the country demanded, constantly created new counties out of territory included within the old. As these new counties were organized four leagues of land for the support of schools were granted to each. This course was never at all dis-

turbed by the fact that the parent county had already received a like grant. No policy of the Republic and State has been more fixed and constant than this. The Constitution itself recognized it, and assured to the counties the title to lands "heretofore or hereafter" granted to them.

When the Act of 1881 was passed there was in force a statutory provision, in which this policy was enforced, that, "each county shall be entitled to four leagues out of the vacant and unappropriated public domain, for free school purposes," and providing the manner in which each *organized* county which had not received such grant, might obtain it "upon application of the Commissioners' Court." Rev. Stats., 1879, art. 4032.) Under this any county, newly created and organized, could have received certificates for its four leagues and have appropriated them out of any land unappropriated anywhere in the State. If the construction of the Acts of 1881 and 1883 contended for by relator be the correct one, they absolutely removed from the reach of all counties but those then existent and unorganized and those organized ones whose locations had failed, or should fail, all the land embraced in the survey of three hundred and twenty-five leagues. We think what we have said justifies the assertion that this would not have been done intentionally; that, if the language used forces the conclusion that it was done at all, it is to be explained only by the supposition that the legislators thought no more counties would be created, or that the possibility of such creation did not present itself to their minds. With counties of such vast extent as that of Tom Green and others in existence,· out of which more than twenty new ones have been created, such an assumption as the first would hardly be justified. That it, as well as the other, is excluded, clearly appears from action taken on the Act of 1881 in its passage through the Legislature. In the caption of the bill, as it was. introduced, was the word, "present," before "unorganized counties," which would have expressed relator's contention exactly; but that word was stricken out by amendment in the House. This clearly shows that the very question was considered and that the intention was not to restrict the benefits of the provision to the (then) present unorganized counties. This is further· indicated by the number of leagues to be surveyed and reserved. There were sixty unorganized counties whose claims would have been satisfied by two hundred and forty leagues. Three hundred, enough to provide for fifteen additional counties, were reversed. This is not accounted for, as suggested by counsel, upon the supposition that the Legislature merely made an unnecessarily liberal provision to be sure of its sufficiency. The number of counties and the number of leagues which each was to receive were definitely known and the reservation was not of an indefinite quantity, or area, of public lands, but of so many leagues to be surveyed and specially set apart. Had it been the purpose merely to secure the leagues to the existing counties, the land to which others must look for satisfaction of their rights would surely not have been depleted to a greater extent than was necessary to that purpose.

These reasons argue very strongly against the contention that, by the use of the language, "the unorganized counties," the Legislature

referred only to those then existing, and intended a reservation for their benefit to the exclusion of others which might subsequently be formed, and suggest that a broader meaning should be given to those words. We think it plain that the leading purpose of the Act was not so much to provide for particular counties as it was to preserve the means with which to carry out the established policy with reference to all counties. The organized counties either had received their lands or could do so without delay; such as needed further protection were eventually provided for. The other class, those which were not in a situation to receive grants at once, were the ones for whose benefit a reservation was needed and this necessity existed with reference to all that were to organize in the future, to those that were both to be created and organized as well as those that were only to be organized. It is not unreasonable to say that the Legislature, looking forward to organizations to take place in future, referred to all counties which should thereafter organize, as "the unorganized counties," without any reference to the time of their creation. The reservation was made because of the fact that for want of organization alone lands could not be supplied to all counties at once; and the intention, we think, was to make all of them the beneficiaries as they should organize and the language may be so construed as to effectuate this intention. The language of section 7 is especially suggestive of this construction; "As each of the unorganized counties in the State shall be organized, such county shall be entitled to the first four leagues . . . which shall not have been patented to other counties for free school purposes." To express fully the meaning contended for by relator, the first clause of this sentence should have read "as each of the *present* unorganized counties," as the original caption did, and the last clause should have read, "which shall not have been patented to some other of *such* counties." As it is, the language can operate in favor of any county as it is organized, and assumes that at any time land applied for by one county may have been patented to some other county. Any county coming into existence at a date subsequent to the enactment of these statutes would first be created by law and then organized. Between the creation and organization it would be an unorganized county and come within the language and spirit of the Act.

The construction of these statutes which we adopt has been that steadily and consistently acted upon by the Commissioners of the Land Office and the Governors of the State since 1885 in issuing patents for lands out of this reservation to counties created after 1883 as they were organized. No question has ever been raised, so far as we are advised, of the correctness of their action until this suit was brought. If we were doubtful we should probably regard the case as one in which this executive construction should be followed, but, after giving the question mature thought, we are clearly of the opinion that the action of the officers was correct; that the reservation was intended for the benefit of all counties afterwards organized, without regard to the date of their creation. The result has proved that enough land was not reserved to satisfy all counties. This is much to be regretted, especially so if no way can be found to supply the loss to those which

have received nothing. But the mistake can not be remedied by giving to one county that which another, equally entitled, has already received in accordance with law.

*Mandamus refused.*