# JUNE, 1917

## C. C. SLAUGHTER v. YOAKUM COUNTY.

### No. 2645. Decided June 11, 1917.

1.—County School Land—Act of 1881—Grant—Reservation—Legislative Power.

The Act of March 26, 1881 (Laws, 17th Leg., p. 65), providing for the survey of 300 leagues of public land and the setting aside of same as a reservation for the benefit of unorganized counties of the State, did not constitute a grant to such counties, but a reservation to provide for such grant in the future. Title remained in the State; and it was in the power of a subsequent legislature to deal with such reservation as was done by the Act of April 7, 1883, Laws, 18th Leg., p. 45, permitting counties previously organized but which had not received grants of land for public school purposes to participate in the distribution of the lands so reserved. (P. 46.)

2.—Same.

The language of the Act of 1881, that the lands so surveyed "shall constitute a reservation out of which," etc., are not consistent with the idea of a present grant of such land to counties to be organized; nor is the express declaration of sections 1 and 7 of such Act that such counties should be entitled to the land only on their becoming organized and paying to the State the surveying and patenting fees. (Pp. 50, 51.)

3.—Same.

It was within the power of the Legislature to make such provision for maintaining public schools in the counties as, in its wisdom, was best suited to their situation; and the rights of the counties were only such as they derived from its legislation. (P. 51.)

4.—Same.

Though in the dedication of property for public uses the want of a grantee capable of taking by grant will not of itself defeat the donation where there has been such enjoyment of the property as that its interruption will prejudice public and private rights, the elements of estoppel which inhere in that doctrine are not present in this case. (P. 52.)

5.—Same.

That the Act should operate as a present conveyance of the State's title presupposes a present right in the counties under the Act to receive the title. Until the counties acquired a vested right in the land the title remained in the State; and no such vested right was acquired by an Act which merely fixed the time when and the requirements by performance of which they should become so entitled. (Pp. 52, 53.)

6.—Same.

In the proviso to section 7 of the Act (Laws, 17th Leg., p. 65) that any county failing to pay the surveying and patent fees within three years after its organization "shall forfeit all claims to the land herein donated," the term "donated" is to be interpreted by reference to the other provisions of the Act, and thus construed is not indicative of a present grant. (Pp. 53, 54.)

7.—Same—Case Stated.

Yoakum County was unorganized when the Act of March 26, 1881, created a reservation of public land to be granted to such counties on their organiza-

tion. Shackelford County was an organized county which had received no school land, and which, by the subsequent Act of April 7, 1883, was permitted to acquire lands surveyed as such reservation. In 1886 it received patent under the latter Act to four leagues of school land out of such reservation. Yoakum County, created by the Legislature in 1876, but not organized until 1907, applied thereafter for patent on the lands granted to Shackelford County, and, patent being refused because of the previous grant of same, sued Slaughter, who had acquired the title of Shackelford County. Held that the Act of 1883, under which the latter's patent was issued, was within the power of the Legislature, and the title of Shackelford County and of its grantee was valid. (Pp. 45-56.)

Error to the Court of Civil Appeals for the Seventh District in an appeal from Tarrant County.

Yoakum County sued Slaughter. Judgment for defendant was, on plaintiff's appeal, reversed and rendered in favor of appellant. (160 S. W., 1175.) Slaughter thereupon obtained writ of error.

*Henry C. Cooke,* for plaintiff in error.—The Act of 1881 was not a grant and did not divest the State of its title to and ownership of the land set apart and reserved or in any manner impair the dominion of the Legislature over said land. Yoakum County v. Robison, 103 Texas, 145; Act of April 7, 1883; Acts of Legislature, 1897, p. 86; Rev. Stats., 1895, art. 4282a; Boatner v. Ventress, 8 Martin (La.), N. S., 644, 20 Am. Dec., 270-272; Union P. Ry. Co. v. Karges, 169 Fed., 461; Peterson v. Baker, 81 Pac., 681-682.

An unorganized county in Texas has no such existence as makes it capable of taking a grant. Yoakum County v. Robison, 103 Texas, 149.

*Sayles, Sayles & Sayles,* for defendant in error.—The passage of the Act of March 26, 1881, entitled "An Act to provide for designating and setting apart three hundred leagues of land out of the unappropriated public domain for the benefit of the unorganized counties of the State, and to provide for the survey and location of the same," together with the segregation of the 300 specific leagues of land from the mass of the public domain by survey and location on the ground in 1882, created a vested right in defendant in error, Yoakum County, to the four leagues in controversy, by legislative grant in praesenti. Caption of an Act part of the law: M., K. & T. Ry. Co. v. Mahaffey, 150 S. W., 881 (2) 883. "Reservation" and "Grant" synonymous: Jones v. Meehan, 175 U. S., 1, 44 L. Ed., 1. A vested grant: State v. Delesdenier, 7 Texas, 108; Wilcox v. Jackson, 13 Peters, 513; Act of March 26, 1881, General Laws of Texas of 1881, p. 65; Constitution of Texas of 1876, art. 7, sec. 6, and its amendment of 1883; Holmes v. Robison, 124 S. W., 629; Talley v. Lamar County, 104 Texas, 295, 137 S. W., 1125; Lamar County v. Talley, 127 S. W., 272 (1), 275; Lamar County v. Talley, 94 S. W., 1069, 1070; Logan v. Stephens County, 98 Texas, 283, 83 S. W., 365, 366; Logan v. Stephens County, 81 S. W., 109, 110; Jernigan v. Finley, 90 Texas, 212; Smisson v. State, 71 Texas, 222 (1), 231; Milam County v. Bateman, 54 Texas, 153; Fannin County v.

Riddle, 51 Texas, 360, 367; Act of Republic of Texas of January 26, 1839, p. 120; Constitution of State of Texas of 1845, art. 10, secs. 3 and 4; Act of January 16, 1850, General Laws of Texas of 1850, p. 37; Constitution of Texas of 1861, art. 10, secs. 3 and 4; Constitution of Texas of 1866, art. 10, sec. 6; Act of April 23, 1879, General Laws of Texas of 1879, chap. 135, p. 150; Act of February 6, 1884, General Laws of Texas of 1884 (S. S.), p. 38; Act of February 6, 1884, General Laws of Texas of 1884 (S. S.), p. 57; Act of April 8, 1889, General Laws of Texas of 1889, p. 108, being arts. 4306 and 4307, Rev. Stats. of Texas of 1895. A grant in praesenti: Ft. W. & D. C. Ry. Co. v. Western Stock Yds. Co., 151 S. W., 1172, 1173 (1); St. Paul & Pac. Ry. Co. v. Northern Pac. R. Co., 139 U. S., 1, 5, 6; United States v. Detroit T. & L. Co., 200 U. S., 321, 335; Simpson v. Stoddard Co., 173 Mo., 421, 73 S. W., 700, 703; Banton v. Crosby, 95 Me., 429, 50 Atl., 86; Langdeau v. Hanes, 21 Wall., 521; Wright v. Roseberry, 121 U. S., 488, 497; Northern Pac. Ry. Co. v. Majors, 2 Pac., 322, 327, 5 Mont., 111; Schulenberg v. Harriman, 21 Wall., 44, 60; Missouri, K., etc., Ry. Co. v. Kansas Pac. Ry. Co., 97 U. S., 491; Railway Co. v. Baldwin, 103 U. S., 426; Dartmouth College v. Woodward, 4 Wheaton, 518; Green v. Biddle, 8 Wheat., 1; New Jersey v. Wilson, 7 Cranch, 164; Wolff v. New Orleans, 103 U. S., 358, 367.

The obligation of the grant of the four leagues of land in controversy to Yoakum County, by the Act of the Seventeenth Legislature of March 26, 1881, can not be impaired by the Act of the Eighteenth Legislature of April 7, 1883, such four leagues of land having been segregated from the public domain by survey and location in 1882. Constitution of U. S., art. 1, sec. 10; Constitution of Texas, art. 1, sec. 16; Talley v. Lamar County, 104 Texas, 295, 137 S. W., 1125; Milam County v. Bateman, 54 Texas, 153, 166; Fletcher v. Peck, 10 U. S. (6 Cranch), 137, 5 L. Ed., 162; Grogan v. San Francisco, 18 Cal., 590, 612; United States v. Northern Pac. Ry. Co., 12 Pac., 769, 770, 6 Mont., 351; Town of Pawlet v. Clark, 9 Cranch, 292; Terrett v. Taylor, 9 Cranch, 43, 52; Dartmouth College v. Woodward, 4 Wheat., 518, 4 Cond. Rep. U. S., 526, 555; Davis v. Gray, 16 Wallace, 203, 232; Green v. Biddle, 8 Wheat., 1, 5 Cond. Rep. U. S. Sup. Ct., 369, 391; New Jersey v. Wilson, 7 Cranch, 164; Wolff v. New Orleans, 103 U. S., 358, 367.

The Act of April 7, 1883, neither expressly nor impliedly repeals the Act of March 26, 1881. On the other hand, the Act of 1883 confirms and affirms all of the Act of 1881, except the requirement in the last mentioned Act of payment of patent fees. The reason for the enactment of the Act of April 7, 1883, as set out in its preamble, namely, the location of twenty-five additional or supernumerary leagues by the contractor under the Act of March 26, 1881, must enter into the construction of the said Act of April 7, 1883, so as to determine what was intended to be accomplished by said Act of April 7, 1883. No express

repeal:   Sec. 5 of Act of April 7, 1883, p. 45; Hess v. Reynolds, 113 U. S., 73, 79, 80; United States v. Greathouse, 166 U. S., 601, 605, 606; Frost v. Wenie, 157 U. S., 46, 58; United States v. Healey, 160 U. S., 136, 147; Ex. parte Crow Dog, 109 U. S., 556, 570, 571.   No implied repeal:   Act of March 26, 1881, General Laws of Texas of 1881, p. 65; Act of April 7, 1883, General Laws of Texas of 1883, p. 45; Conley v. Daughters of the Republic, 106 Texas, 80, 156 S. W., 197; Herndon v. Reed, 82 Texas, 647, 651; Hanrick v. Hanrick, 54 Texas, 101, 108, 109, 110; Wood v. United States, 16 Pet., 342.   Reason for enactment: Hidalgo County Dr. Dis. No. 1 v. Davidson, 102 Texas, 539, 120 S. W., 849; Lanferman v. Vanzile (Ky.), 150 S. W., 1008.   Pari Materia: Cain v. State, 20 Texas, 355, 362; Hanrick v. Hanrick, 54 Texas, 101, 109; Conley v. Daughters of the Republic, 106 Texas, 80.

Yoakum County had legal existence at the time the Act of the Seventeenth Legislature of Texas, approved March 26, 1881, took effect, and was then capable of being a grantee, although it could not then possess such grant.   Holmes v. Robison, 103 Texas, 145, 124 S. W., 629; Thompson v. Waits, 159 S. W., 82-85; Wright v. Wright, 99 Mich., 170, 58 N. W., 54, 23 L. R. A., 196; Constitution of Texas of 1876, art. 7, sec. 6; Acts of Texas Legislature of 1884, p. 57; Acts of Texas Legislature of 1889, p. 136 (being Texas Rev. Stats. of 1911, art. 1345); Bell County v. Alexander, 22 Texas, 351, 359; Milam County v. Bateman, 54 Texas, 153.

The passage of the Act of the Seventeenth Legislature, approved March 26, 1881, together with the segregation of the original 300 leagues of land from the mass of the public domain by survey and location on the ground in the year 1882, constituted a legislative grant in praesenti to Yoakum County of the four leagues of land in controversy. Numerical order immaterial: Murray v. State, 21 Texas App., 466, 477, 478; Uvalde v. Burney, 145 S. W., 311, 312.   Recovery from trespasser: Ney v. Mumme, 66 Texas, 269; Murrell v. Wright, 78 Texas, 519, 523; Pilcher v. Kirk, 55 Texas, 208, 216; Robertson v. Johnson, 57 Texas, 63, 65; Contreras v. Haynes, 61 Texas, 103, 106; Gaither v. Hanrick, 69 Texas, 92, 98; Carley v. Parton, 75 Texas, 98, 103; Jett v. Hunter, 111 S. W., 176.   Grant on condition subsequent:   Ryan v. Porter, 61 Texas, 106; Barclay v. Cameron, 25 Texas, 241; Wiederanders v. State, 64 Texas, 133, 139; Berryman v. Schumaker, 67 Texas, 312; Schulenberg v. Harriman, 21 Wall., 44, 62; Ft. W. & D. C. Ry. Co. v. Western Stockyards Co., 151 S. W., 1172, 1175 (2), construing Special Laws 1873, chap. 208, sec. 15, p. 589 (7 Gammel's Laws of Texas, p. 1289).   Dedication:   Oswald v. Grenet, 22 Texas, 100; Hunter v. Trustees, 6 Hill, 407, 411; Holmes v. Robison, 103 Texas, 145, 124 S. W., 629.

MR. CHIEF JUSTICE PHILLIPS delivered the following memorandum opinion:

The plaintiff in error, holding under the patent of the State, has a lawful and complete title to the land in controversy unless the Act of March 26, 1881, amounted to an irrevocable grant on the part of the State to the unorganized counties of the State. We think the effect of that Act was to create a reservation for the benefit of such counties and that it was not a grant; and it was, therefore, within the power of the Legislature to deal with the reservation as was done by the Act of the succeeding Legislature in 1883, under which latter Act the patent was issued under which the plaintiff in error holds.

The judgment of the Court of Civil Appeals is reversed and the judgment of the District Court is affirmed.

The opinion in the case will be later filed.

Filed May 17, 1916.

MR. CHIEF JUSTICE PHILLIPS delivered the opinion of the court.

This case is one wherein Yoakum County sued C. C. Slaughter for certain land. It was decided near the close of the last term, the judgment of the Court of Civil Appeals being reversed and that of the District Court, which adjudged the land in controversy to the defendant, Slaughter, being affirmed. A memorandum opinion was at that time filed, with the intention on the part of the writer to later set forth more fully the grounds of the decision. To that end the present opinion is filed.

The real question presented by the case is whether a certain Act of the Legislature,—the Act approved March 26, 1881 (General Laws of 1881, chapter 61, page 65),—which provided for the setting apart out of the unappropriated public domain of three hundred leagues of land for the benefit of the unorganized counties of the State for free school purposes, of which each of such counties, as organized, was to receive four leagues, and the survey of the three hundred leagues thereunder, operated as a present grant of such land so as to at once invest such unorganized counties with the title; or was simply a legislative reservation of the land for the purpose stated, in respect to which there still remained the legislative power of disposition for other, or additional, constitutional uses.

The succeeding Legislature asserted such power; and, assuming that the title to the lands set apart by the previous Act,—which had been surveyed pursuant to its provisions, but none of which had then been patented,—was yet in the State, enacted a law, the Act of April 7, 1883 (General Laws of 1883, chapter 55, page 45), whose effect was to make of such lands a reservation for free school purposes for the benefit both of the unorganized counties of the State, and such organized counties, as well, as had failed to obtain title to their four leagues of land previously appropriated in their behalf for that purpose; it being also provided that all laws in conflict with the Act were repealed.

In brief, the object of the legislation embodied in these two Acts was to enable both the organized and the unorganized counties of the State

to respectively obtain their full complement of four leagues of land for school purposes, in accordance with the established policy of the State.

Shackelford County was an organized county when the Act of 1881 became effective, having been organized on September 12, 1874. In 1875 school land certificates for four leagues were issued it, which were located in Motley County, the patents issuing in 1877. Because these patents were in conflict with the older valid surveys they were cancelled in 1886; and during the same year the four leagues in controversy here, being part of league No. 81, leagues Nos. 82, 83, 84, and part of league No. 85, surveyed under the Act of 1881, were patented to it under the Act of 1883, constituting the only land ever received by it by valid title for school purposes. The defendant, Slaughter, holds the title of Shackelford county, having paid for the land in full.

Yoakum County was created by the Legislature in 1876, but was not organized until 1907. No land has ever been patented to it for school purposes. Following its organization, it made request to the Commissioner of the General Land Office for patents to the four leagues out of three hundred leagues surveyed under the Act of 1881 to which it claimed to be entitled under the Act, in writing stating that if its request was refused, it should apply to the land in controversy, making in that connection a lawful tender of the surveying and patent fees. The Commissioner refused its request upon the ground that all of the leagues surveyed under the Act of 1881 had previously been patented to other counties of the State.

The position of Yoakum County in the case is that the Act of 1881, together with the actual survey in 1882 of the three hundred leagues thereby appropriated, amounted to a present irrevocable grant by the State of those leagues to the unorganized counties of the State; that as one of the then created and unorganized counties of the State it thereby acquired title to the four leagues in controversy; that the Act of 1883, in so far as it sought to appropriate to other uses any of the three hundred leagues set apart and surveyed under the Act of 1881, was of no effect, and the patents to the four leagues in controversy issued Shackelford County thereunder were accordingly void; and that if under the Act of 1881 it did not acquire the title to the specific four leagues in suit, it at least thereby took title to an interest of four leagues in the three hundred leagues referred to, entitling it to maintain the suit for the specific leagues against one wholly without any title to them.

While the Act of 1881 made an appropriation and authorized the survey of three hundred leagues, three hundred and twenty-five leagues were surveyed and numbered under the Act and their field notes returned to the Land Office, the twenty-five extra leagues being designated by the locating surveyor as supernumerary leagues Nos. 1 to 25, inclusive. This designation was disregarded by the Commissioner, who numbered them as Nos. 301 to 325, inclusive; the three hundred leagues being likewise consecutively numbered.

As before stated, none of these leagues had been patented when the Act of 1883 was adopted. The provisions of the Act of 1881 had been executed no further than the surveying of the land and making the proper return and record of the field notes of the respective leagues. Such was the condition when the Legislature by the Act of 1883 provided that the three hundred and twenty-five leagues thus surveyed should constitute a reservation out of which each of the unorganized counties, as it was organized, should be entitled to receive four leagues for free school purposes, and out of which such organized counties as had failed, from any cause, to obtain title to the four leagues to which they were respectively entitled for that purpose under previous laws (art. 4032, Rev. Stats., 1879; arts. 3464, 3468, Paschal's Digest), should also be entitled to receive so much land as might be necessary to make up their lawful complement.

Following the Act of 1883 and pursuant thereto, throughout a period extending from August 7, 1883, to May 8, 1909, the leagues and parts of them were patented alike (1) to counties which were organized when the Act of 1881 took effect; (2) to counties then created but unorganized, and (3) to counties created thereafter; those of the last class having been held by this court in Yoakum County v. Robison, 103 Texas, 145, 124 S. W., 629, to be "unorganized counties" within the intention of the Act of 1881. The entire three hundred and twenty-five leagues had been thus patented prior to the filing of the present suit.

The distribution of the leagues by patent among the counties of the three classes named was as follows:

Thirty-seven leagues and a fraction, including the four patented to Shackelford County, were patented to twenty-three different counties which were organized when the Act of 1881 became effective.

Two hundred and fifteen leagues and a fraction, with some minor exceptions, to fifty-five different counties which were then created but unorganized.

And seventy-two leagues to eighteen different counties thereafter created.

Of the thirty-seven and a fraction leagues patented to the organized counties, leagues and parts of leagues bearing the following numbers were patented prior to the patenting of the four leagues in controversy to Shackelford County, namely, Nos. 21, 22, 23, 24, 25, 26, 3211 acres in No. 27, 28, 420 acres in No. 29, 30, 31, 32, 33, 34, 39, 40, 41, 42, 43, 44, 1895 acres in No. 45, 2533 acres in No. 53, 54, 55, 56, 2365 acres in No. 57, 322, 323, 324 and 325.

If the Act of 1881, with the survey of the three hundred leagues thereunder, amounted to a present irrevocable grant of those leagues to the unorganized counties, the title of the twenty-three organized counties to the entire thirty-seven and a fraction leagues patented to them, except as to leagues and parts of leagues out of the original twenty-five supernumerary leagues and bearing numbers succeeding league No.

300,—comprising, relatively, a small amount of the land thus patented, —is void.

It is not necessary to set out the Act of 1881 in its entirety. Such parts of it as serve to reveal its character and purpose will be given.

Its caption was as follows:

"An Act to provide for designating and setting apart three hundred leagues of land out of the unappropriated public domain for the benefit of the unorganized counties of the State, and to provide for the survey and location of the same."

Section 1 provided a board, constituted by the Governor, Comptroller, Treasurer, Attorney General, and Commissioner of the General Land Office, to contract for the surveying and returning to the General Land Office of the field notes and plats of three hundred leagues of land from any of the unappropriated public domain within the State, or any of the reserve made by the Act of the Legislature of July 14, 1879, which, the section continues, *"shall constitute a reservation out of which each of the unorganized counties of this State, as it may be organized, shall be entitled to four leagues of land for free school purposes."* The remainder of the section, with sections 2, 3, and 4, related to the letting of the contract for the surveying, the making of such contract, and provision for its security. Section 5 provided for a proper record of the field notes and maps of the surveys, declaring that the books containing them should constitute an archive in the General Land Office. Section 6 related to the marking and establishing of the corners of the leagues on the ground.

Section 7 was as follows:

"Each league of land shall be numbered in the order it is surveyed by the contractor or contractors, beginning at No. 1 and extending to No. 100, and as each of the unorganized counties in the State shall be organized, such county shall be entitled to the first four leagues out of the reservation authorized by this Act, which shall not have been patented to other counties for free school purposes, upon the payment to the treasurer of the State the actual costs of the surveying fees and legal interest thereon from time of payment by the State; and upon the payment of the cost of surveying and patent fees, the Commissioner of the General Land Office is hereby required to issue patents to said county for four leagues of land as above provided; *provided,* any county that fails to pay surveying and patent fees under this Act, within three years after its organization, shall forfeit all claims to the lands herein donated."

Section 8 provided for the supervision and control of the contracting surveyors in the making of the surveys; and section 9 for the powers of the board in respect to the time and manner in which the plats and field notes of the surveys should be made. Section 10 made it a penal offense for anyone charged with the execution of the Act to file upon or locate any lands for himself or other person while thus employed

by the State. Section 11 prohibited the drawing of any money out of the State Treasury for the execution of the Act until the three hundred leagues of land had been surveyed and their field notes returned to the Land Office. Section 12, the concluding section of the Act, provided an appropriation of $4500 for its execution.

The Act of 1881 does not impress us as having, either in itself or in connection with the survey of the land thereby authorized, the force of a present grant of the land. Its provisions reveal no such purpose. As distinguished from a present conveyance of the title, its object, in our opinion, was simply to create a certain reservation of the public domain as a means of enabling the State, in the execution of its established policy, to make, in the future, to the unorganized counties the same land donation for school purposes as under other laws was authorized to the organized counties, and in that connection to provide the time when and the conditions under which the right of such counties to the land thus reserved for their benefit should accrue. This, we think, stands out plainly as the meaning of the Act. It was not a present donation of the land. It was a law making provision for a future donation.

Convincing proof that no present divestiture of the State's title was intended is found in the fact that the immediate purpose of the Act was the creation of "a reservation," and, further, that it was only through the reservation thus created that its ultimate purpose was to be accomplished. If it was the contemplation of the Act that the title to the three hundred leagues should, upon the completion of the authorized survey, at once vest in all the unorganized counties of the State, as Yoakum County here claims, why the express provision that the land thus surveyed "should constitute a reservation"? Why was the land "set apart," if it was the intention that the title thereto should at once vest? There could be no occasion for "setting it apart" by means of the survey, if the survey was to be then and there efficient to divest the State of its title. To set land apart, to constitute it a reservation, signifies something other than a present conveyance of the title. These are not appropriate terms of conveyance. They are terms of segregation. They indicate, not a present disposition of that which is segregated, but its future use for a definite purpose. In this Act they denoted a continuance of the State's ownership and control. As long as any of the land remained a part of the reservation, it was the land of the State. It was intended, of course, that the State's title should eventually pass to the counties. The time when they were to become entitled to it was definitely fixed by the Act. But the fact that by its express terms the land was "set apart" and constituted "a reservation," shows very plainly that it was the intention of its framers that there should be a period under its operation during which the State's right to the land should be paramount and its dominion supreme. This feature of the Act indicates, we think, as plainly as language could, the retention of the State's title throughout such period; and it, in turn, negatives all idea that any present conveyance of its title was intended.

That any immediate vestiture of title in the unorganized counties was contemplated, is furthermore plainly refuted by the express declaration found in sections 1 and 7, that they should be entitled to the land only upon their becoming organized counties and their fulfillment of the requirement of the Act in respect to the payment of the surveying and patent fees. The provision of section 1 is, that the three hundred leagues to be surveyed "shall constitute a reservation out of which each of the unorganized·counties of this State, *as it mdy be organized,* shall be entitled to four leagues of land for free school purposes." The provision of section 7, after directing the numbering of the surveyed leagues, is, *"and as each of the unorganized counties of the State shall be organized,* such county shall be entitled to the first four leagues out of the reservation authorized by this Act, which shall not have been patented to other counties for free school purposes, *upon the payment to the•Treasurer of the State the actual costs of the surveying fees and legal interest thereon from time of payment by the State; and upon the payment of the cost of the surveying and patent fees, the Commissioner of the General Land Office is hereby required to issue patents to said county for four leagues as above provided."* These are the provisions of the Act, and the only ones which relate to *the right* of the counties to receive the land.

While from the beginning of its career the State has recognized its obligation to make provision for the counties in respect to the maintenance of free schools, and, in consequence, during the early days of the Republic entered upon the policy of making to them donations of public lands for that purpose, their original rights to such lands were only such as the Legislature conferred in its execution of the mandate given first in the Constitution of the Republic and in each succeeding Constitution of the State, enjoining upon it the duty of furnishing a general system of public free schools. Whatever the nature of the several acts of this character passed for the benefit of the organized counties of the State, in dealing with the subject as related to the unorganized counties it was within the power of the Legislature to make such provision for their benefit as in its wisdom was best suited to their situation. The Acts of 1881 and 1883, constituting the legislation on the subject, were the extent of their right.

It was but natural in the enactment of such a law that account should be taken of the difference between their status and that of counties which were organized. While there were sixty of such unorganized counties in existence when the Act of 1881 was passed, the Act, as already stated, was intended, as well, for the benefit of counties which might thereafter be created. The Legislature, therefore, in the devising of this law, was confronted with the problem of making suitable provision in this respect for corporate bodies not yet in being, and, as to those which were in being, for bodies unorganized, incapable of exercising their corporate functions, and, therefore, unable in their present state to appropriate the benefits of a land donation. It was these considerations, necessarily,

which induced the Legislature to frame the Act as it did, and which were responsible for the marked difference between its provisions and those of the several Acts of the same general character theretofore passed for the benefit of the organized counties. As to counties already organized, in the full possession of their powers, and altogether capable of exercising them, there could be little reason for creating a reservation of the public domain for their benefit, or postponing until a future event their right to receive the land designed for their benefit. We, therefore, find those acts,—for illustration, the original Act of the Republic, of January 26, 1839,—so drawn as to presently entitle those counties to their quantum of land upon their compliance with the provisions of the Acts. But in carrying out this same general policy for the benefit of counties not only not organized, but those not yet in existence, there was presented a different condition to be dealt with. Though the principle be fully recognized that in the dedication of property to public uses the want of a grantee capable of taking by grant will not of itself defeat the donation where there has been such enjoyment of the property as that its interruption will prejudice public and private rights, the elements of estoppel which inhere in that doctrine are not present here, and it furnishes no aid in the solution of this question, which is simply one of the true intent and proper construction of this Act. As to counties not yet in existence, certainly no present investiture of title was contemplated. It could have been of no present benefit, and was not essential to execute the design of the Act. This was equally true as to the counties already created but still unorganized, and hence incapable of applying the land to its intended beneficial uses. Therefore it was that "a reservation" was created by the Act as the means of withdrawing the land from other appropriation, thus saving it for this particular purpose, and making possible its devotion to such purpose when its beneficiaries should become capable of receiving its benefits and applying them to their intended use. Hence the provision that each county *as it might be organized* should become entitled to the respective four leagues.

To say that the Act and the survey thereunder were intended to operate and did operate as a present conveyance of the State's title, presupposes, necessarily, a present right in the counties under the Act to receive the title. It can hardly be contended that the effect of the Act and the survey was to presently vest the title unless thereby there was created a present right in the counties to the land. There could not be, at the same time, title in the State and a vested right in the counties. Until the counties acquired a vested right, the title remained in the State. They could acquire no vested right until, in accordance with the provisions of the Act, they became entitled to the land.

As to the survey of the land, it was by the terms of the Act entirely disassociated from the right of the counties to the land. Instead of having any bearing upon their right to the land or its accrual, the survey was but the means of accurately defining the reservation.

The provisions of the Act which dealt with the right of the counties to the land and to receive the title are those hereinbefore quoted. They fixed the time when the counties were to be entitled to the land and prescribed the requirement the performance of which was a condition of their becoming so entitled. In a word, they provided the time when and the conditions under which the counties, severally, might acquire a vested right in the respective four leagues. The time thus fixed was when the counties became organized. The requirement to be performed was the payment of the surveying fees with interest and the patent fees. If while the Act continued in force any of these counties had perfected its organization and had paid or duly tendered these fees, it would have "become entitled" to four leagues out of the reservation in their numerical order, and would have acquired a vested right in those leagues. The issuance of the patent would have been merely a minis-terial act in that event, upon which the county's title would not have been dependent. But until it was organized and complied with the requirement in respect to the payment of the fees, what right did the Act confer upon any of the beneficiary counties? Where is there to be found any intention that the title of the State should vest in any county except as it became entitled to the land according to the Act, both in respect to time and by performance of the condition imposed? If each county was to be presently entitled to four leagues of the land as soon as it was defined by survey, why was there interpolated in the provisions which alone dealt with its right to receive the land, the qualifying clauses "as it may be organized," and "upon the payment of the actual costs of the surveying fees and legal interest thereon from the time of payment by the State"?

Postponing any county's becoming entitled to the four leagues in-tended for its benefit until it was organized, simply amounted to a declaration that in its unorganized state it was not entitled to them.

To hold that there was any present conveyance of the State's title merely through the survey is, by bare construction, to vest the title in the counties at a time when, according to the Act, they were not en-titled to the land and had no right in it which could have been enforced. It is to disregard the plain provisions of the Act. It is to ignore their certain declaration that each county should become entitled to the four leagues only as it might be organized and upon its payment of the fees named. It is to ascribe to the Legislature an intention of vesting the State's title in a body not yet entitled, under its own law, to the land, and therefore in violation of its own law. That such was the inten-tion is not, in our opinion, conceivable. The Act, accordingly, is not to be so construed.

The only expression in the entire Act which, by any possibility, in-dicates a purpose to presently vest the title is the phrase, "herein do-nated," found in the proviso at the conclusion of section 7. The pro-viso reads: "Provided, any county that fails to pay surveying and

patent fees under this Act, within three years after its organization, shall forfeit all claims to the lands herein donated."

This phrase plainly refers to other provisions of the Act, and must, therefore, be interpreted by them. It is clearly a term of reference, as here used. Unless by other provisions a donation was effected, this phrase would not of itself impart to the Act the force of a donation. As has been shown, the other provisions of the Act have no such force. The Act gains its meaning from them. They determine its character. To regard this phrase as indicative of a present grant puts it in antagonism with all the rest of the Act. Though such meaning be given it, in determining the effect of the Act it could not be allowed to prevail over all of its other provisions. It was used, we think, simply in the sense that the land was set apart for the benefit of the counties. The land might be regarded as "donated" in the sense that it was segregated and made the subject of an intended donation. It is to be noted that it was not the land which was to be forfeited under the operation of this proviso. It was merely the county's "claim" to the land.

It is not necessary to here determine whether these counties in their unorganized state were capable of receiving a grant of public lands. Regardless of the question of their capacity in this regard, this Act did not treat them as presently *entitled* to a grant, and it must have been deemed by the Legislature that they were not in a situation to receive a grant. Such was the view entertained by the court in its consideration of this Act in Yoakum County v. Robison. While the question which determines this case was not there presented, the able opinion of Mr. Justice Williams shows a careful study of the Act, and is of weight in its interpretation. Upon this feature it was there said:

"We think it plain that the leading purpose of the Act was not so much to provide for particular counties as it was *to preserve the means with which to carry out the established policy with reference to all counties.* The organized counties either had received their land or could do so without delay; such as needed further protection were eventually provided for. The other class, *those which were not in a situation to receive grants at once,* were the ones for whose benefit a reservation was needed and this necessity existed with reference to all that were to organize in the future, to those that were both to be created and organized as well as those that were only to be organized. It is not unreasonable to say that the Legislature, looking forward to organizations to take place in future, referred to all counties which should thereafter organize, as 'the unorganized counties,' without any reference to the time of their creation. The reservation was made *because of the fact that for want of organization alone lands could not be supplied to all counties at once;* and the intention, we think, was to make all of them the beneficiaries *as they should organize* and the language may be so construed as to effectuate this intention."

The cases of Milam County v. Bateman, 54 Texas, 153; Fannin County v. Riddle, 51 Texas, 360, and Talley v. Lamar County, 104

Texas, 295, 137 S. W., 1135, have no bearing upon the question which this case presents. The rights of Milam County, Fannin County and Lamar County to the lands involved in those cases were those conferred upon organized counties under the Acts of January 26, 1839, and January 16, 1850, and which, as organized counties, they acquired by compliance with those Acts. In the Milam County case it was held that the title of a county to lands which had so vested under those Acts could not be divested by the Legislature. In the Fannin County case it was held that Fannin County had not forfeited its title so acquired because of a failure to return the field notes of the land it had caused to be located in virtue of the Act of 1839, since that Act did not require their return within any specified time, or work a forfeiture if they were not returned; and that the Act of February 10, 1852, requiring generally the return of field notes of surveys made prior to its passage to the General Land Office by August 31, 1853, had no application to surveys of county school lands. In the Lamar County case substantially the same question was presented as in the Fannin County case. In each of the latter cases the question simply was whether the appropriation made by Fannin and Lamar Counties, respectively, of the lands involved was such as invested them with title under the Acts of 1839 and 1850. They furnish no aid in the determination of the effect of the Act of 1881.

Neither is the question here affected by section 6 of article 7 of the Constitution. Had the Act of 1881 been of such a character as to presently invest the unorganized counties with title, the lands would, of course, have constituted granted lands, and the rights of the counties thereto would have been protected from adverse legislation by this constitutional provision. The question here is not in respect to any right which had once vested, but whether the effect of this Act was to vest any right. Such was not its effect.

If no vested right was created by the Act of 1881, the Legislature retained its power over the land, and it had full authority to adopt the Act of 1883, under which Shackelford County acquired a valid title to the leagues in controversy, which in turn passed to the defendant, Slaughter. The Act of 1883 necessarily worked a repeal of the Act of 1881 to the extent that the latter set aside the land for the exclusive benefit of the unorganized counties.

The construction we have given the Act of 1881 is that which it has received at the hands of the legislative and executive departments of the State government for the past thirty years, and which had not been challenged, as we are aware, until the filing of the present suit. Under that construction a large quantity of this land has been patented to organized counties for school purposes, and possibly much of it has passed into the hands of innocent holders in reliance upon the State's patent. If this construction were clearly wrong, it would be our duty to disregard it, and we would do so. But it should not be cast aside

and these titles struck down unless it is clearly wrong. We regard it as clearly right.

It follows, as we have heretofore held, that the judgment of the Court of Civil Appeals, awarding the land to Yoakum County, was erroneous, and that of the District Court, awarding it to Slaughter, was correct.

*Reversed and judgment of District Court affirmed.*

Opinion filed June 11, 1917.